LILL (BRADLEY v.). See Case No. 1,783.

---

## Case No. 8,348.

### The LILLA.

[2 Spr. 177;[1] 25 Law Rep. 81.]

District Court, D. Massachusetts. Sept., 1862.[2]

PRIZE—CAPTURE IN NEUTRAL WATERS—CLAIMS OF PRIVATE PERSONS — PROCEEDINGS OF PRIZE COURTS OF THE CONFEDERATE STATES — RESTORATION OF MERCHANT VESSELS—RIGHTS OF OFFICERS AND CREW OF A PRIZE.

1. No private person can interpose in a case of prize and make claim for the restoration of the captured property, on the ground that the capture was made within neutral waters. Whatever

[1] [Reported by John Lathrop, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 15,600.]

claim is made must be presented by the neutral nation whose rights have been infringed. Even a consul, by virtue of his office merely, cannot interpose.

2. Where a claimant had his domicil in the enemy's country, was a permanent resident there, and the property captured was purchased as stock in a trade to be there carried on, the claim was dismissed, as coming within the decision of the court in the case of The Amy Warwick [Case No. 341].

3. If a neutral owner of a portion of the property captured, claims another part, which belongs to an enemy, for the purpose of deceiving the court, the part belonging to the neutral will be condemned, as a penalty for his fraudulent conduct.

4. The admission of further proof rests wholly in the discretion of the court; but the exercise of this discretion is aided by certain rules. Some of these rules stated. A motion for further proof refused, where there was no reason to suppose that any further evidence of value could be produced.

[Cited in Cushing v. Laird, 107 U. S. 82, 2 Sup. Ct. 206.]

5. The proceedings of a prize court of the so-called Confederate States are of no validity here, and a condemnation and sale by such a court do not convey any title to the purchaser, or confer upon him any right to give a title to others.

6. The rule under the statute of the United States, 1800, c. 14, § 1 [2 Stat. 16], concerning the restoration to their owners, upon payment of certain salvage, of merchant vessels recaptured, before their valid condemnation, by public armed vessels, applied by analogy to the case of a vessel recaptured after a capture by a Confederate privateer, and a condemnation and sale by a Confederate prize court.

7. The officers and crew of a prize, in case of condemnation, are not entitled to wages from the prize property. Where a prize is condemned, the officers and crew who are sent in as witnesses in pursuance of the law of nations, are not entitled to witness fees or compensation for their necessary detention from out of the prize property. Where such persons, after their examination is satisfactorily completed, are further detained, not for the purposes of the prize cause, but under an order from the navy department for public reasons, their compensation or damages, if they are entitled to any, cannot be charged on the prize property.

In admiralty.

R. H. Dana, Jr., U. S. Atty., for the captors.

F. C. Loring, for Maxwell and others, the Americans claimants.

C. G. Thomas, for R. G. Bushby and others, the British claimants, cited The Bermuda, 3 Wall. [70 U. S.] 514; The Springbok, 5 Wall. [72 U. S.] 1; The Pearl, Id. 574.

SPRAGUE, District Judge. This vessel and cargo were captured on the 3d day of July last, off Abaco, by the United States gunboat Quaker City, and sent into this district for adjudication. The counsel for the claimant contends that the capture was made within British waters, and that the property should be restored to the claimants for that reason.

To this there are two answers. First, the fact that the capture was made within the jurisdiction of a neutral country, is not proved. Second, if it were proved, no private person can interpose or rest a claim

upon that ground. In such case, whatever claim may be presented must be by the neutral nation whose rights have been infringed. So far from a private individual being authorized to represent the nation in this respect, even a consul cannot do so by virtue of his office. The Anne, 3 Wheat. [16 U. S.] 435; The Sir William Peel, 5 Wall. [72 U. S.] 517. In the case now before me, neither the British consul, nor any other British officer, has interposed in any manner.

I now proceed to the several claims, and shall first consider that of Hewetson to the medicines, a part of the cargo. It appears that he is a British subject having his home in Charleston, S. C., where he was a permanent resident prior to his capture. "His son-in-law keeps a druggist's shop in Charleston, and Hewetson is interested with him; these medicines were for his shop." It further appears that this vessel, with Hewetson on board, sailed from Charleston the 2d of March last, with a cargo of cotton and tobacco, ran the blockade, and arrived at Liverpool on the 2d day of April.

Hewetson there procured these medicines, shipped them on board this vessel, and himself took passage in her, and sailed from Liverpool on the 15th of May, bound for Nassau, New Providence, and was captured on the voyage. This claimant had his domicil in the enemy's country, was a permanent resident there, and this property was purchased as stock in a trade to be there carried on. This claim, therefore, comes within the decision of this court in the case of The Amy Warwick [Case No. 341].

There are other facts proper to be noticed in this connection, which have a bearing not only upon this claim of Hewetson, but on other parts of the case. Not one of the documents or papers found on board this vessel states or indicates that Hewetson had any property on board. On the contrary, all these drugs and medicines are documented in the name of R. G. Bushby, the claimant of the vessel. The freight list declares that Bushby was the shipper thereof. The bill of lading states the same, and that they are to be delivered to order or assigns. This bill of lading is not indorsed; that is, the shipper does not appear to have ordered the contents to be delivered to any one. Here was not only a suppressio veri, a concealment of the fact that these goods were shipped and owned by Hewetson, but the documents falsely represent that they were shipped by R. G. Bushby, a British subject residing in Liverpool.

I have thus far treated the question of Hewetson's right, as if he were regularly before the court as a claimant. But he is not. He has been in Boston ever since this vessel was brought in, and was in court at the hearing: and yet the only claim filed is by Applebee, as master, in behalf of the owners of the cargo, as well as of the vessel. And even in this claim Hewetson's name is not mentioned, and he is described only as "a passenger, the owner of thirty-seven packages of medicines on board." Not only his name, but his residence, is omitted. The language of the claim is so peculiar, that, without the exposition of it given by the counsel, I should not have deemed it a claim in behalf of Hewetson.

I next proceed to the claim to the vessel made through the master by the same R. G. Bushby. This vessel was built in Wells, in the state of Maine, and was called the Betsy Ames, and was owned by the American claimants, Maxwell and others, inhabitants of that place. After the breaking out of the rebellion, she was captured by a Confederate privateer, under the command of Henry S. Libby, and carried into Charleston, S. C. There it is supposed certain proceedings were had in a tribunal, acting under the assumed authority of the Southern Confederacy, by which the vessel was condemned and sold; and her name was changed to the Mary Wright. The purchasers were John Fraser & Co., a commercial house doing business in Charleston. Afterwards, on the 2d of March last, she ran the blockade as before stated, and was commanded by the same Captain Libby.

She arrived at Liverpool on the 2d day of April, and on the 24th of the same month was registered as a British vessel, called the Lilla, and in the name of R. G. Bushby as sole owner. On the 15th of May she sailed from Liverpool for Nassau, N. P. Two objections are made to this claim: First, that Bushby is merely a nominal owner, that the beneficial interest is in Fraser & Co., and that, if he holds the legal title, it is only as trustee for enemies; second, that even if Bushby was an actual purchaser for value, and for his own use, still that the original title of Maxwell and others has never been divested, and that their claim must prevail. As to the first objection, there are certainly facts which seem to be irreconcilably opposed to the supposition that Bushby was a real purchaser for his own use; while every circumstance is consistent with his having lent his name to cover enemy's property, and taken the legal title in trust for that purpose.

The shipping articles declare that Fraser, Trenholm, & Co. are the managing owners. These articles bear date the 13th of May, the same day on which the vessel cleared at the custom house. In this document, they are not only declared to be the owners, but the managing owners. Further than this, it appears from the testimony that the advance wages of the crew were actually paid by Fraser, Trenholm, & Co., and there was found on board a return list of the crew, stating the monthly wages and the amount of the advance wages of each. This is directed on the back to Messrs. Fraser, Trenholm, & Co. It is without date or signature, and may have been kept as a copy. Of these

facts no explanation has been offered even in argument.

In what relation Fraser, Trenholm, & Co. stood to John Fraser & Co. does not appear by any satisfactory evidence. Of all the witnesses, Libby probably knows the most concerning them. He says in his deposition that he was consigned to Fraser, Trenholm, & Co., and that he supposes that they had a power of attorney to sell the vessel.

By the ship's papers, Applebee appears to have been the master. But this same Captain Libby, who sailed in her nominally as a passenger, actually took the command as soon as she left Liverpool, and acted as master until she came in sight of the United States gunboat Quaker City, when Applebee became the acting commander. This is shown by the testimony of several of the crew, and particularly that of Sanderson, the mate, who also testifies that Applebee informed him that he, Applebee, was to act as mate until they reached Nassau. Indeed, it is not now controverted that Libby did, to some extent, act as master of this vessel after she left Liverpool. How is this to be accounted for, if neither Libby nor his former employers had any interest in the vessel?

Here was a British master with a mate and a majority of the crew British, on board a vessel sailing from one British port to another, permitting a foreigner to take the command of the vessel, who, according to some of the testimony, exercised it with a high hand. Captain Applebee, in other parts of the case, does not seem to have been of a pliable or submissive disposition. When this vessel was boarded from the Quaker City, and he was directed to go on board that ship, he drew a pistol and threatened to shoot the first man who should attempt to enforce that order, and this while he was under the guns of the man-of-war.

Among the papers found on board is a bill in favor of a block and mast maker, for various articles, at various dates, from the 22d of April to the 14th of May, the day before her sailing, amounting to £48. This bill is against Captain Libby and owners of brig Lilla. It is well known that the military and other wants of the South have in a great measure been supplied from Great Britain, by the way of the West Indies, and especially through the port of Nassau. This trade, so detrimental to us, must, of course, be watched with jealous scrutiny by our cruisers. If, therefore, Fraser & Co., having this vessel at Liverpool, intended to send her to Nassau, they would seek the cover of some neutral flag, and none would be so convenient or safe as the British. There is evidence tending to show that that firm had a steamer at Liverpool called the Scotia, which was to follow the Lilla to Nassau, and there take her cargo and Libby on board for Charleston. If the Scotia should leave Liverpool with a full cargo, the coal consumed in crossing the Atlantic would leave a considerable capacity to be filled at Nassau. On the other hand, if an English merchant were disposed to engage bonâ fide in trade from Liverpool to Nassau, he would hardly select or employ a vessel of the antecedents of the Mary Wright, and employ her former master, Libby. Both must have become notorious by the previous capture and running the blockade, and liable to be recognized by a boarding-officer from an American man-of-war.

It is quite improbable that a British merchant, carrying on a legitimate trade, would unnecessarily have encumbered it with these suspicious circumstances, which might subject it to interruption, and cause the vessel and cargo to be sent in for investigation

Nor is this all. It has already been stated that Hewetson's part of the cargo was covered by the name of this claimant, R. G. Bushby. In his examination before the prize commissioners, Hewetson stated that he had his bills of lading in his trunk. They have never been seen by the prize master or commissioners. Hewetson further stated that the bill of lading which was found on board, and which is marked No. 10, is a copy of his bills of lading, and that it has upon it the initials both of his name and that of his son-in-law; that he never knew R. G. Bushby, and does not know how this bill of lading came to be made out in his name. He further states that he paid the freight of his shipment in advance,—that they would not take it on other terms. It thus appears that he did not contract with Bushby for the carriage of his goods, but with some other persons, who required the freight in advance; and they, it must be presumed, caused his goods to be covered by a bill of lading and freight list in the name of this claimant. This unquestionable fact, that the name of Bushby was used to cover enemy's property belonging to Hewetson, must at least inflame every presumption arising from the evidence that his name was also used to cover the vessel. If a neutral owner of a portion of the property claims another part which belongs to an enemy for the purpose of deceiving the court, the part belonging to the neutral will be condemned, as a penalty for his fraudulent conduct. The St. Nicholas, 1 Wheat. [14 U. S.] 431; The Betsy [Case No. 1,364]; The Graaff Bernstorf, 3 C. Rob. Adm. 111.

In The Eenrom, 2 C. Rob. Adm. 1, a portion of a cargo belonging to a neutral was condemned because he had documented in his own name another portion belonging to an enemy, for the purpose of deceiving belligerent cruisers, and with the evident intention of claiming it as his own before a prize court, although that intention was never carried into effect, and his claim actually embraced only his own property. There is no doubt that enemy's goods were documented in the name of the claimant Bushby for the purpose of deceiving the cruisers of the

United States. I am not under the necessity of deciding what would have been the effect of this masking of enemy's property if it were the only circumstance adverse to this claim, because there are other stringent facts against it. The only letter of advice found on board this vessel was one from R. G. Bushby to Adderley & Co., at Nassau. It is as follows:—"Liverpool, May 15, 1862. Messrs. Henry Adderley & Co., Nassau: Dear Sirs,—This will be handed to you by Captain Applebee, of my brig Lilla, leaving this for your port to-day; and whom I have directed to report himself on his arrival to your good selves and to confer with you as to the disposition of the cargo. Further instructions will follow by the Nassau mail, leaving this in about three weeks, which will most probably anticipate the present and the arrival of the vessel with you. In the meanwhile, hoping for a safe and speedy voyage for Captain A., dear sirs, yours faithfully, R. G. Bushby."

These were the only instructions found on board, either as to vessel or cargo. They are certainly remarkable for abstinence and reserve. Not one word as to what is to be done, either with the vessel or goods on board. The writer merely informs his correspondents that the master will confer with them as to the disposition of the cargo, and that further instructions will follow by the Nassau mail. But why did not the instructions accompany the vessel and cargo? They would then be sure to be at Nassau the moment they were wanted. The mail which was to follow would be subject to all the contingencies of a sea voyage, and might be long delayed or never reach its destination. If there had been nothing to conceal, the plain course would have been to have sent letters of advice by this vessel, and to have followed them afterwards by duplicates and perhaps additions. If Libby was to control vessel or cargo on reaching Nassau, the peculiarities of this letter of advice may be accounted for. It might serve to give to a boarding officer the appearance of a letter of instructions, when in fact none were given. In The Flying Fish [Case No. 4,892], there were no invoices or letters of advice on board, and it was said that they were transmitted by land. Mr. Justice Story held that "this, if true, affords an irresistible presumption of the hostile character of the cargo."

I am at this moment dealing only with the claim to the vessel, as to which the want of instructions to a correspondent abroad would not ordinarily create the same presumptions as in the case of the cargo. But R. G. Bushby does not appear merely in the character of a ship-owner carrying goods with which he has no concern. He was ostensibly the shipper and owner of a part of the cargo, and his name was used to cover a portion belonging to Hewetson; he had, or pretended to have, correspondents at Nas-

sau, and directed his master to confer with them respecting the cargo; and he wrote the only letter of advice. His reserving all real information or instructions for some other channel of conveyance is such evidence of designed concealment as must greatly prejudice any claim he may present.

A full hearing has been had upon the preparatory evidence, at which some views were expressed by the court. The counsel for the claimant has since filed a motion for an order for further proof. The admission of further proof rests wholly in the discretion of the court. But the exercise of that discretion is aided by certain rules. Further proof is admitted to remove doubts, not to create them. If the preparatory evidence present a clear case of enemy's property, the court will not hear further proof. But even if the case be doubtful, a party may forfeit all claim to the indulgence of further proof by bad faith. The Alexander [Case No. 164]; The Dos Hermanos, 2 Wheat. [15 U. S.] 80. Mala fides and attempts to deceive have been held sufficient grounds for refusing further proof. The Juffrouw Anna, 1 C. Rob. Adm. 126; 1 Wheat. Append. 505; The Graaff Bernstorf, 3 C. Rob. Adm. 117; The Betsy [Case No. 1,364]. If the difficulties do not admit of a fair and satisfactory explanation, if they are out of the reach of any rational solution, further proof will be refused. The Vrouw Hermina, 1 C. Rob. Adm. 163.

Under these rules, it would be difficult for the court to grant a motion for further proof in this case, however sustained. Still I have been willing to hear this motion and the affidavits in support of it, that I might see what evidence the party expects to produce. The motion is sufficiently general. It requests permission to prove that Bushby was a bonâ fide purchaser for a good consideration. In support of this motion were affidavits by the proctor of the claimant, by Applebee, the master, and by Harris, one of the firm of Adderley & Co., at Nassau, and a letter from Bushby to his proctor. The great question is whether Bushby was a bonâ fide purchaser for value, and for his own use. This question the affidavits and the letter can hardly be said to touch. They exhaust themselves upon other topics, viz., in showing that this vessel was regularly documented in the name of Bushby, and was really bound to Nassau, and not to the Southern states,—points not relied upon by the captors, and not requiring further proof. The affidavit of Applebee re-affirms the statement made in his primary examination, that he was employed by Bushby, and hired the crew. He states his introduction to Bushby, and that he did not know of any other owner. But how Bushby came to be owner, for whose benefit he held the legal title, whether he paid any consideration, he does not state. Of all this he says nothing: nor does he explain why Fraser, Trenholm & Co.

paid the advance wages to the crew, and says that he does not know why their names were put into the shipping articles as managing owners. The affidavit of Harris merely gives a letter under date of 7th of June, from Bushby to Adderley & Co. This letter requests that after the discharge of the outward cargo, they will assist the captain in obtaining a homeward cargo to such port in the United Kingdom as they shall consider most advantageous for the ship, and to be advised thereof.

So far as the vessel is concerned, this letter goes to supply the defect of that previously sent by Applebee, and repels the inference that no instructions were ever given in the name of Bushby. The bearing of this letter upon the cargo will be considered hereafter. It seems, from Harris's affidavit, that Bushby was not a person previously known to his firm. He says they received from a certain R. E. Bushby the letter hereto annexed. The claimant's name is R. G.; here the initial E. is substituted for the true one, G., a mistake not likely to have occurred as to a known correspondent.

The affidavit of Mr. Thomas, the proctor, states that he wrote to Mr. Bushby, informing him that the papers were sealed up, and inquiring if the vessel and cargo were in fact bound to Nassau, and if his vessel was duly documented, and his papers in order on board. The answer of Bushby, dated 23d of August, is produced, and states that the vessel was really bound to Nassau, and that he is ready to make affidavit of that fact, and that the vessel was duly documented, and the papers on board were in order. He does not speak of his title to the vessel, or say whether he paid any consideration, or whether he holds her for his own use, or for the benefit of others. Upon these topics this letter, and, for aught that appears, that of the proctor, to which it is an answer, are wholly silent. The correspondence and the affidavits are quite unsatisfactory. They say nothing of the purchase or title of the vessel, and do not state that either of the affiants has any expectation or belief that evidence can be produced of the payment of any consideration by Bushby, or that he holds the vessel for his own benefit. There is no reason to suppose that any further evidence of value can be produced.

The second objection to this claim is also fatal. There is no doubt that this vessel was the property of Maxwell and others, until her capture by a Confederate privateer. But it is contended that she has since been condemned and sold by a prize court in Charleston, S. C., and the purchasers conveyed her to the claimant Bushby. If this were so, of which there is no sufficient proof, still, such proceedings would not divest the title of the original owner. In the case of The Amy Warwick [supra]. this court held, that treating the Confederates in some respects as belligerents was not an abandon-ment of sovereign rights, and by no means precluded us from treating them in other respects as rebels. Most assuredly I shall not recognize the Southern Confederates as a nation, or as having a government competent to establish prize courts. No proceedings of any such supposed tribunals can have any validity here, and a sale under them would convey no title to the purchaser, nor would it confer upon him any right to give a title to others. But it is argued, that, under the queen's proclamation, recognizing the Confederates as belligerents, a British court would hold a sale to be valid. What the decision of a British court might be upon that question, we do not know, it never having been there litigated. But such a decision, if made, would be no more binding upon our courts than the political views of the British government would be upon the president or the congress.

If this second objection were the only matter before the court, it is questionable whether I ought to entertain or listen to it. If this vessel had been arrested on the ocean, without any reason for supposing she was enemy's property, or infringing belligerent rights of the United States, but merely to settle a contested title between a citizen of the United States and a neutral subject, this court would perhaps refuse to go into the question of title, and at once restore the vessel to the person from whose possession she had been thus wrongfully taken. A due regard to the peace of the world might require that, in questions of property between citizens of different nations, the court of one of such nations should not acquire jurisdiction by the wrongful exercise of force upon the ocean. But such is not the posture of this case. There has been no improper exercise of force. There was abundant reason for taking this vessel as enemy's property, and bringing her in for adjudication. She is rightfully within this jurisdiction, and if not condemned as prize, the court should deliver her to the person having the highest title. If, indeed, the question of ownership were wholly between foreigners, the court might refuse to decide it, as we are not bound to exercise jurisdiction merely to settle controversies between foreigners. But we cannot refuse to listen to the claims of our own citizens to property legitimately within our jurisdiction.

The motion for further proof must be refused, and the claim of R. G. Bushby be dismissed, and the vessel restored to the claimants, Maxwell and others, upon what conditions will be stated hereafter.

I now proceed to the claim of Bushby & Co. to the cargo, made through Applebee, the master. This claim embraces all the cargo except what belongs to Hewetson. The only documents found on board, tending to show the ownership of the cargo, are the freight list and bills of lading. These concur in representing that there were five different

shippers; namely, John Senier & Co., Bushby & Co., R. G. Bushby, J. Perrin, Son, & Co., and Henry Lafone.

There is nothing in the evidence to connect these claimants, Bushby & Co., with any part of the cargo, except that shipped in their own name. As to all the shipments, therefore, which appear by the papers to have been made by other persons, this claim must at once be dismissed. The freight list states that Bushby & Co. were the shippers of two parcels of saltpetre, one of 634 bags, and the other of 702 bags, consigned to order. All the other shipments are also consigned to order. The bills of lading all correspond with the freight list, both in the names of the shippers, kinds, and qualities of goods shipped, and state that they are to be delivered to order.

There are two bills of lading, in which Bushby & Co. are the shippers of the above-named quantities of saltpetre, to be delivered to order. On each bill the name of Bushby & Co. is indorsed in blank, and then erased by a line drawn through it. There are four bills of lading in favor of John Senier & Co., all indorsed in blank. The other bills of lading—viz., four in the name of R. G. Bushby, one in favor of J. Perrin, Son, & Co., and one in favor of Henry Lafone—have no indorsement upon them.

From the documents, there is as much reason to suppose that the several shippers who have made no claim were the owners of the goods documented in their name, as that these claimants were the owners of those shipped in their name. It does not appear to whom any of them were consigned. No letter of advice or instructions accompanied the cargo except that already mentioned from R. G. Bushby to Adderley & Co., and that letter, as we have seen, merely said that the master would confer with them respecting the cargo, and that instructions would be sent by mail. This was most extraordinary. Why were not instructions sent with the cargo, rendering it certain that they would arrive when needed? Why kept back for a mail-steamer, which might be delayed, or never reach its destination?

The case of The Flying Fish has already been mentioned, in which Mr. Justice Story, after referring to the statement of the master, that the invoices and letters had been sent by land, says, "This, if true, affords an irresistible presumption of the hostile character of the property." Here some papers accompanied the cargo, but they gave no information as to the consignee, or the disposition to be made of the goods. All this was reserved for a conveyance more safe from search and inspection. Even the letter that did accompany the goods, such as it was, was written only by R. G. Bushby, one of the apparent shippers, and the ostensible owner of the vessel. Neither these claimants nor any other shipper sent any instructions or communications whatever. Nor does it appear that they have ever done so, either to any person at Nassau, or to any agent or proctor conducting this cause.

A motion has been filed for further proof in relation to the cargo. This motion is by, and in the name of, the proctor. It states that said shippers, John Senier & Co., and Bushby & Co., and R. G. Bushby, and J. Perrin, Son & Co., and Henry Lafone, have ever been, and still are, bonâ fide shippers and owners of the cargo, each in the proportion standing in their names in the freight list on file. No claim has been made by, or in behalf of, any of the shippers except Bushby & Co. and Hewetson. For these Applebee, the master, intervened, stating that he was informed and believes that a passenger was the owner of a part, and Bushby & Co. of all the rest of the cargo. And this was supported by his test affidavit. The proctor now, in his motion, asserts that each and every shipper was the owner of all the goods shipped in his name; thus declaring that Bushby & Co. never owned any part of the cargo except the saltpetre above mentioned. In the freight list, R. G. Bushby is the shipper of 600 boxes of soap and 1137 coils of rope and other articles. In his letter of the 23d of August, this same R. G. Bushby, after speaking of the vessel, says, with reference to the cargo, This does not belong to me, but was shipped by various parties; and, as ship-owner acting for the interest of all concerned, I approve of the course determined upon with the saltpetre. Here is a distinct disclaimer of the ownership of the cargo without reservation of any part.

He undertakes, merely as ship-owner, to sanction the sale made at Boston of the saltpetre. Where are Messrs. Bushby & Co., of Liverpool, the alleged owners of the saltpetre? Why were they not consulted? If they have any real interest in the matter, why have they not been heard from, either directly or indirectly, since the commencement of these proceedings? We do not learn that they have, up to this moment, ever made any communication whatever to any person, either at Nassau or Boston, in relation to this cargo. All that has been written respecting it has been by R. G. Bushby. His letter of the fifteenth day of May, to Adderley & Co., stated that further instruction would be sent by the Nassau mail. By the affidavit of Harris, it appears that a subsequent letter was sent dated the 7th of June, giving some instructions as to the vessel, but not a word as to the cargo shipped at Liverpool. Nor does it appear that any one of the ostensible shippers has ever made any consignment, order, or communication, or manifested any interest respecting the cargo.

The affidavits in support of this motion do not set forth any further evidence in support of this claim, or state any facts from which it may be inferred that any such exists. Indeed, not one of the affiants states that he expects or believes that any such further proof

can be produced. The difficulties which encompass this claim seem not to admit of any rational solution. No explanation, in any degree satisfactory, has been offered; and there is no reason to suppose that any further material evidence can be obtained.

The motion for further proof must be refused, and the claim made on behalf of Messrs. Bushby & Co. dismissed, and the cargo condemned. To prevent misapprehension I think proper to say that I do not question that trade may be lawfully carried on between one neutral port and another, even in goods contraband of war. However detrimental may be the bringing of such articles to the immediate vicinity of the enemy's country so as to facilitate the running of the blockade, still, if the voyage is really to terminate at a neutral port, it cannot be interrupted. But if it is not to end there,—if the actual destination be to the enemy's country, to touch only at the neutral place for the purpose of facilitating the enterprise by concealing the destination as far as possible,—then the voyage may be treated according to its true character, as one to an enemy's port. But that inquiry is unnecessary here. My decision rests entirely upon other grounds.

It remains only to determine upon what conditions the vessel shall be restored to Maxwell and others. By Act 1800, c. 14, § 1 (2 Stat. 16), it is provided that when a merchant vessel, belonging to any person under the protection of the United States, shall have been taken by a public enemy, and shall be recaptured by a public armed ship of the United States, such vessel not having been condemned by competent authority before the recapture, the same shall be restored to the former owners upon payment of one-eighth part of the true value, for and in lieu of salvage. The language of this statute is perhaps in strictness applicable only to captures in an international war. But the analogy is so close, that I think it most proper to adopt the rule therein prescribed in the present case. By the 4th section of the statute, the whole of such salvage is to go to the captors. I shall order restoration of the vessel to Maxwell and others upon payment, to the captors, of one-eighth part of the value thereof, and of all costs and expenses which they have incurred on account of the vessel.

After the vessel and cargo were condemned, a hearing was had upon the petition of the mate and four of the crew of the prize that wages and compensation for their detention as witnesses might be allowed them out of the proceeds of the vessel and cargo.

SPRAGUE, District Judge. The petitioners are British subjects, and joined the brig in Liverpool, under articles to go to Nassau and back, the vessel being documented as British and under a British flag, with British subjects held out as owners and as master. There is no evidence that the petitioners knew or suspected that these appearances were false, when they shipped, or sailed. She was captured near Nassau, and has been condemned as enemy's property. The master, officers, and crew were brought in and examined by the prize commissioners, and these petitioners seem to have testified fairly.

As the capture has been held justifiable, the captors are not personally responsible to the crew of the prize. Their claim for wages must rest on their lien on the vessel and cargo. But courts of prize do not regard these liens in favor of neutrals on prize vessels or cargoes. I have asked the counsel for the petitioners to find me a precedent for allowing wages out of the proceeds of a condemned vessel, and he admits that he can find none. The claim for wages, therefore, cannot be allowed against the fund, either on principle or authority. If the petitioners engaged on board this vessel with knowledge of the falsity of her assumed neutral character, they can expect nothing of the belligerent. If they were deceived, they have a claim for damages upon the merchants in Liverpool who deceived them.

The other branch of the petitioners' claim is for their detention here after the vessel's arrival. The law of nations requires captors, when they take in a vessel, to send in also the master, and some of the crew. They are sent in in obedience to the international law, as much for the benefit of the owners of the property, as of the captors. The failure to send them in is cause of grave complaint by neutral powers whose citizens may claim a vessel or cargo as their property. It is supposed that, if the voyage and title are honest, such persons may be able, by their testimony, to corroborate the documents, or to explain any unfavorable appearances. Here again I have asked the counsel for the petitioners, if a precedent was to be found for allowing compensation from the prize fund, in case of condemnation, to the crew of the prize, for their necessary detention for the purposes of the examination. No such precedent has been found. In this respect, therefore, as in regard to wages, I must disallow the claim, as without precedent, and as not consistent with the general principles of prize law.

But it seems that after the prize commissioners had completed the examination, and there was no longer need to detain the petitioners for the purposes of this cause, they were further detained for more than forty days. For this further detention, they claim compensation. It is said that this detention was by an order from the secretary of the navy to the prize commissioners. It must be supposed that the department had sufficient reasons for making this order, and for continuing the detention of the men; but the reasons do not appear to have been connected with any judicial proceedings in this cause. The further detention was not at the request of the captors, nor was it for their benefit. When the petitioners had completed their tes-

timony, which was fairly given, and turned out to be useful to the captors and the government, this court and the captors had no farther control over them or right to detain them. The further detention was an executive act of the government, for its own purposes. I do not think that I ought to charge compensation or damages for this detention, upon the captors, or upon the prize fund. To charge it on that fund would be to charge it upon the captors.

[This case was affirmed on appeal in Case No. 15,600.]