CUSHING *v.* LAIRD.

FOSTER *v.* CUSHING.

1. When persons summoned as garnishees in a libel in admiralty *in personam* are adjudged by the court to have a fund of the principal defendant in their hands and to pay it into court, and the libellant afterwards obtains a final decree against him with an award of execution against the fund in their hands, the first order is interlocutory, and they can appeal from the last decree only.

2. A final decree of acquittal and restitution to the only claimant in a prize cause determines nothing as to the title in the property, beyond the question of prize or no prize; and another person, who actually conducts the defence in the prize cause in behalf and by consent of the claimant, without disclosing his own title under a previous bill of sale from the claimant, is not estopped to contest the claimant's title in a subsequent suit brought by creditors attaching the property or its proceeds as belonging to the claimant.

APPEALS from the Circuit Court of the United States for the Southern District of New York.

The facts are stated in the opinion of the court.

*Mr. J. Langdon Ward* and *Mr. Robert D. Benedict* for Cushing.

*Mr. J. Hubley Ashton, Mr. Cornelius Van Santvoord, Mr. A. J. Vanderpool,* and *Mr. James Thomson, contra.*

MR. JUSTICE GRAY delivered the opinion of the court.

This is a libel in admiralty, filed in the District Court for the Southern District of New York by John N. Cushing and others against John Laird, Jr., to recover damages for the destruction of the libellants' vessel, the " Sonora," by the " Alabama." The defendant was not found and never appeared in the cause, and his credits and effects were attached in the hands of Foster & Thomson, garnishees.

The garnishees answered that they had in their hands a fund amounting to $31,441.62, known as the proceeds of the steamer "Wren," which was the property of Charles K. Prioleau and not of Laird. Upon the trial of the issue raised by this answer, the District Court, in April, 1873, adjudged that the fund belonged to Laird, and ordered the garnishees to pay it into court. See 6 Benedict, 408. From that decree the gar-

nishees appealed to the Circuit Court. The District Court afterwards, in September, 1873, entered a decree in favor of the libellants against Laird for the sum of $143,298.70, and costs, " and that the libellants have execution thereon, to satisfy this decree, against the property of the said respondent, and especially against his property, credits, and effects in the hands of Foster & Thomson, garnishees." From this decree also the garnishees appealed to the Circuit Court.

The Circuit Court dismissed the first appeal, and retained the cause for hearing on the second appeal only; and, upon consideration, entered a decree by which it was adjudged that the fund in the hands of the garnishees was not the property of Laird, and could not be subjected to the payment of the decree against him, the attachments against the garnishees were discharged, and both decrees of the District Court, so far as affected them and the fund in their hands, were reversed with costs. See 15 Blatchf. 219.

The findings of fact by the Circuit Court are printed at length in 15 Blatchf. 220–236, and, so far as they are material to be stated, are as follows: —

The steamer " Wren " was built at Birkenhead, England, in 1864, by Laird Brothers, and was registered on the 24th of December, 1864, at Liverpool, in accordance with the laws of Great Britain, in the name of John Laird, Jr., as owner; a certificate of the registry was issued in due form; the vessel sailed from Liverpool, having the certificate on board as part of her ship's papers, and it did not appear that she ever again entered a British port. On the 3d of January, 1865, after she had left Liverpool, Laird executed to Charles K. Prioleau, of Liverpool, a member of the firm of Fraser, Trenholm, & Company, for the consideration of £15,450, a bill of sale of the vessel, which, on the 1st of May, 1865, was duly entered at the custom-house in Liverpool, and the vessel registered in the name of Prioleau as owner. On the 13th of June, 1865, on the high seas, on a voyage from Havana to Liverpool, by the way of Halifax, Nova Scotia, some of the crew took forcible possession of the vessel, overcame her officers, ran her into Key West, and there delivered her to the naval authorities of the United States.

On the 16th of June, 1865, the Attorney of the United

States for the Southern District of Florida filed in the District Court for that district an information against the vessel as prize of war.  She was taken into the custody of the marshal, and a monition issued to all persons interested to appear on the 27th of June and show cause against a decree of condemnation.  On the 26th of June Edward C. Stiles, master of the vessel, appeared in court and filed a claim, stating that he was the master, and, as such, the lawful bailee of the vessel, and claimed the same for the owner thereof; and that Laird, a British subject, residing in England, was the true and *bona fide* owner of the vessel, and that no other person was the owner thereof, as appeared by her register in the possession of the court, and as he was informed and believed; denying that she was a prize of war, and praying restitution and damages.

The only certificate of registry found on board was that granted on the 24th of December, 1864, upon which were noted, at the British Consulate in Havana, changes of masters on the 24th of March and the 10th of June, 1865, and at the foot of which was the following: " Note.  A certificate of the registry granted under the Merchant Shipping Act, 1854, is not a document of title.  It does not necessarily contain notice of all changes of ownership, and in no case does it contain an official record of any mortgage affecting the ship."

On the 17th, 19th, and 20th of June, 1865, the depositions of the master and other officers of the vessel were taken *in preparatorio;* and on the 27th of June the court proceeded to hear the case upon the allegations and pleadings, the depositions taken *in preparatorio,* and the papers, letters, and writings found on board the vessel.  On the 29th of June the court, of its own motion, directed the prize commissioner to take immediately the testimony of the officers, and of any other witnesses who might be produced by the claimants from persons on board the vessel, upon specified interrogatories; of two persons named, and any others on board produced by the captors, upon some of the same interrogatories; and of any witnesses, produced either by the captors or the claimants from persons not on board, upon certain other interrogatories; and allowed two days to the parties to produce witnesses.  Under this order testimony was taken; and on the 3d of July

the court resumed the hearing upon the allegations and pleadings, the depositions taken *in preparatorio*, the papers found on board, and the depositions taken under the order allowing further proof.

The court, on the 8th of July, announced its opinion, condemning the vessel, but, on account of exceptions taken to some rulings, delayed making a decree in form until the 15th of August, when it was duly entered, reciting that a claim had been interposed by the master in behalf of Laird, that the case had been heard as aforesaid, and that it appeared to the court that the " Wren " was, at the time of capture, the property of enemies of the United States ; and adjudging her to be condemned and forfeited to the United States as lawful prize of war, and to be sold by the marshal, and the proceeds to be deposited with the Assistant Treasurer of the United States, subject to the order of the court. . From that decree the claimant, on the same day, appealed to this court. The vessel was afterwards sold, and the proceeds of the sale deposited with the Assistant Treasurer.

Prioleau still resided in England, and it did not appear that he had any actual knowledge of the proceedings for condemnation until after the entry of the decree. He afterwards retained Foster & Thomson, the garnishees in this case, attorneys and counsellors at law in the city of New York, to do whatever might be necessary for the protection of his interests; and they procured a copy of the record of the District Court and had the appeal docketed in this court, and employed additional counsel, who argued the case here on the record sent up. No additional testimony was taken, and no change in the pleadings made or applied for. Upon the argument in this court, the counsel for the United States insisted that it appeared from the evidence that the vessel, at the time of the capture, was the public property of rebel enemies, and, in support of this position, referred to the testimony of witnesses who swore that Fraser, Trenholm, & Company were her owners. The counsel for the appellant insisted that there was not a particle of evidence that she was ever enemies' property, but that the evidence was conclusive that she was at all times the property of Laird, a British neutral.

This court, at December Term, 1867, reversed the decree of the District Court, and remanded the cause, with directions to restore the vessel to the claimant, without costs.   Mr. Justice Nelson, in delivering the opinion, said that the only question in the case was whether the vessel was the property of enemies of the United States; and, in discussing this question, observed that upon the proofs that the claimant built the vessel and put the master in command in this, her first voyage, the presumption would seem to be very strong, if not irresistible (nothing else in the case), that he continued the owner for the short period of six months that elapsed after she was built and before the seizure took place; that in addition to this she was in command of a master claiming to represent Laird as owner; that these acts, in connection with the registry, afforded strong evidence that the title of the vessel was in the claimant, and that, although it was not unnatural to suspect, from the surrounding facts and circumstances, that the so-called Confederate States or their agents had some interest in or connection with her, there was no sufficient legal proof that they owned the vessel.

After that decree of this court, Foster & Thomson made and sent to Prioleau a draft of a power of attorney to be executed by Laird and by Stiles, and in due time received from Prioleau the power so executed, authorizing Foster and Thomson to receive from the United States, or from any officer or depositary thereof, restitution of the proceeds of the sale of the " Wren ; " and obtained a mandate from this court, and sent it, together with a copy of their authority, to the Attorney of the United States for the Southern District of Florida, requesting him to see the appropriate decree entered and a draft upon the Assistant Treasurer in New York for the payment of the money to their order transmitted to them, and also employed F. A. Dockray, an attorney in Florida, to aid them in procuring the money from the registry of the court; and did not, in any of their letters to the District Attorney or to Dockray, mention that any other person than Laird was or pretended to be the owner of the fund in court.

Some of the libellants in this case having filed a libel in that court to recover for the wrong complained of in the present

suit, with a prayer for an attachment of the fund in the registry, and an attachment having been made accordingly, an arrangement was made between Foster & Thomson and J. L. Ward, proctor for the libellants, with a view of transferring the litigation to New York for the convenience of the parties, and of having the fund transmitted to Foster & Thomson in New York, as authorized attorneys in fact of Laird, to be held by them long enough to enable process to be served upon them in behalf of the libellants. Pursuant to that arrangement, Dockray, acting under his employment by Foster & Thomson, appeared in behalf of Laird in the libel filed against him in Florida, and claimed the proceeds of the " Wren " in the registry of that court, and exhibited the mandate of this court; and upon his motion, with Ward's consent, the attachment was dismissed, and a decree entered, by which, after reciting the decree of this court reversing the decree of condemnation and ordering the property to be restored to the claimant, it was ordered, adjudged, and decreed that the proceeds of the " Wren," after deducting costs, charges, and expenses, and amounting to $31,441.62, on deposit with the Assistant Treasurer of the United States at New York, be paid to said John Laird, claimant, and, it appearing that Foster & Thomson were his lawfully authorized attorneys, that said proceeds be paid to them. That sum was accordingly transmitted to Foster & Thomson, and is the matter in controversy in this case. In the course of the negotiations which preceded that arrangement, Ward was in no manner given to understand that there was any ownership or claim of ownership of the fund, other than such as appeared on the face of the record and the power of attorney filed with the mandate, and in point of fact he did not know or have any reason to believe that Foster & Thomson were acting in any other capacity than as attorneys for Laird and Stiles, representing their several interests, as disclosed by the record in this court. Foster & Thomson never had any personal communication with Laird, nor received any instructions from him, but were actually employed by Prioleau, and communicated with Laird through him only.

The libellants requested the Circuit Court to make the following conclusions of law: " 1. The Prize Court in Florida

condemned the ' Wren ' as enemy property.   2. The Supreme
Court in reversing that decree decided that the ' Wren ' was
not enemy property, but was the property of John Laird, Jr.
3. The garnishees, acting for Prioleau, procured the Supreme
Court to make that decision.   4. Prioleau is chargeable with
notice of all the proceedings in the Prize Court and in the
Supreme Court.   5. The proceeds of the ' Wren ' in the Prize
Court were subject to the attachment served upon them in the
District Court of Florida at the time when the consent of the
libellants' proctor to the dissolution of such attachment was
obtained.   6. The decision of the Supreme Court binds the
garnishees herein and Prioleau, and is conclusive against them,
and cannot be re-examined in this suit.   7. Prioleau is estopped
from denying in this suit that John Laird, Jr., was the owner
of the ' Wren,' and of the proceeds thereof when the same were
attached herein.   8. The garnishees are estopped from setting
up that these funds in their hands are not subject to the attach-
ment in this suit; and also from setting up that John Laird, Jr.,
was not the owner thereof, or that Prioleau was the owner
thereof, when the attachment herein was served."

The Circuit Court declined to make the conclusions of law
proposed by the libellants, and made and filed the following
conclusions of law : " 1. As Prioleau was in fact the owner of
the ' Wren ' at the time of her capture, he was in law the owner
of the proceeds in the registry of the court after her sale.   2.
The sentence of acquittal in the prize cause relieved the fund
in court from all claim on the part of the captors, and left the
owners free to assert their rights as against the world.   3. The
decree in the prize suit did not adjudge the fund to Laird as
owner, or deprive Prioleau of his interest.   4. The delivery of
the fund to Foster & Thomson, as agents of Laird, placed them
in the same situation in respect to it that would have been
occupied by Laird if it had been put into his hands instead of
theirs.   5. As Laird was not the real, but only the apparent,
owner of the fund, he would have taken it, if payment had
been made to him, in trust for Prioleau.   6. Foster & Thomson,
as his agents, hold it upon the same trust, and are not account-
able to the libellants in this action.   7. The decree of the
District Court, requiring Foster & Thomson to pay the fund

into court, and subjecting it to the payment of the amount found due the libellants from Laird, was wrong and should be reversed."

The Circuit Court allowed a bill of exceptions tendered by the libellants, in which they excepted to each of its conclusions of law, and to its refusal to make each of the conclusions of law proposed by them.

The libellants appealed from the last decree of the Circuit Court in favor of the garnishees; the garnishees appealed from the earlier decree of that court, dismissing their appeal from the first order of the District Court against them; and the two appeals have been argued together.

In a court of admiralty, as in a court of common law, a process of foreign attachment is auxiliary and incidental to the principal cause. Second Rule of Practice in Admiralty, 3 How. iii. *Manro* v. *Almeida*, 10 Wheat. 473; *Atkins* v. *The Disintegrating Company*, 18 Wall. 272. Neither the principal defendant nor the garnishees can appeal until after a final decree against them. The first decree against these garnishees, ascertaining their liability, was interlocutory only, and, if the libellants had ultimately failed to recover judgment against the principal defendant and execution against the garnishees, would have been of no avail to the libellants, and of no effect against the garnishees. The appeal of the garnishees from this interlocutory order of the District Court was therefore rightly dismissed by the Circuit Court, and the order of dismissal must be affirmed.

Upon the merits of the case, as presented by the appeal of the libellants from the final decree of the Circuit Court in favor of the garnishees, this court, after full consideration of the elaborate arguments of counsel, is satisfied of the correctness of that decree upon principle and authority.

Prize courts are not instituted to determine civil and private rights, but for the purpose of trying judicially the lawfulness of captures at sea, according to the principles of public international law, with the double object of preventing and redressing wrongful captures, and of justifying the rightful acts of the captors in the eyes of other nations. The ordinary course of proceeding in prize causes is ill adapted to the ascertainment of

controverted titles between individuals.　It is wholly different from those which prevail in municipal courts of common law or equity, in the determination of questions of property between man and man.

In *Lindo* v. *Rodney*, 2 Doug. 613, 614, Lord Mansfield said : " The end of a prize court is, to suspend the property till condemnation ; to punish every sort of misbehavior in the captors ; to restore instantly, *velis levatis* (as the books express it, and as I have often heard Dr. Paul quote), if, upon the most summary examination, there don't appear a sufficient ground ; to condemn finally, if the goods really are prize, against everybody, giving everybody a fair opportunity of being heard.　A captor may, and must, force every person interested to defend, and every person interested may force him to proceed to condemn, without delay."

From the necessity of the case, and in order to interrupt as little as may be the exercise of the belligerent duties of the captors, or the voyage and trade of the captured vessel if neutral, the proceedings are summary.　The libel is filed as soon as possible after the prize has been brought into a port of the government of the captors, and does not contain any allegation as to title, nor even set forth the grounds of condemnation, but simply prays that the vessel may be forfeited to the captors as lawful prize of war.　The monition issued and published upon the filing of the libel summons all persons interested to show cause against the condemnation of the property as prize of war, and is returnable within a very few days, too short a time to allow of actual notice to or appearance or proof in behalf of owners residing abroad.

The law of nations presumes and requires that in time of war every neutral vessel shall have on board papers showing her character, and shall also have officers and crew able to testify to facts establishing her neutrality.　The captors are therefore required immediately to produce to the Prize Court the ship's papers, and her master, or some of her principal officers or crew, to be examined on oath upon standing interrogatories, and without communication with or instruction by counsel. The cause is heard in the first instance upon these proofs, and if they show clear ground for condemnation or for acquittal, no

further proof is ordinarily required or permitted. If the evidence *in preparatorio* shows no ground for condemnation, and no circumstances of suspicion, the captors will not ordinarily be allowed to introduce further proof, but there must be an acquittal and restitution. *The Aline & Fanny,* Spinks Prize Cases, 322, and 10 Moo. P. C. C. 491 ; *The Sir William Peel,* 5 Wall. 517, 534. When further proof is ordered, it is only from such witnesses and upon such points as the Prize Court may in its discretion think fit.

It is doubtless true, as said by Chief Justice Marshall in the passage cited by these libellants from *Jennings* v. *Carson,* 4 Cranch, 2, 23, that " the proceedings of that court are *in rem,* and their sentences act on the thing itself. They decide who has the right, and they order its delivery to the party having the right. The libellant and the claimant are both actors. They both demand from the court the thing in contest." But the point there adjudged was that, pending the proceedings, the property was in the possession of the court, and not left in the possession of either party, without security ; and there is no intimation that a claimant, who proves his right, as against the captors, to have the possession of the vessel restored to him, must also prove his title in the vessel as against other persons not before the court.

The Prize Court will not indeed permit a stranger to dispute the right of the captors, and generally requires a claim to be made by or in behalf of the general owner, and upon oath. But the claimant is required to give evidence of a title to the property, not for the purpose of having that title established by the decree of the Prize Court, but only for the purpose of showing that he is acting in good faith, and is entitled to contest the question of prize or no prize, and to have restitution of possession in case of acquittal. From the necessity of the case, the claim is often put in by the master on behalf of the owner, and it is sufficient if the master's oath is to belief only.

By the practice prevailing in England at the time of the Declaration of Independence, and for some years before and after, the master often put in a general claim for himself and all others interested, without naming them. *The Hendric &*

*Alida*, Marriott, 96, 99, 123; *The Prospérité*, id. 164; *The Jungfre Maria*, id. 273, 283. In the report made in 1753 by Sir George Lee, Judge of the Prerogative Court, Dr. Paul, Advocate-General, Sir Dudley Ryder, Attorney-General, and afterwards Chief Justice, and Mr. Murray, Solicitor-General, and afterwards Lord Mansfield, which was embodied in the famous answer to the Prussian Memorial, the only requisite mentioned of a claim of ship or goods is that it "must be supported by the oath of somebody, at least as to belief." 1 Collectanea Juridica, 129, 135. Sir William Scott and Sir John Nicholl, in their letter to Chief Justice Jay when Minister to England in 1794, stating the general principles of proceeding in prize causes in British courts of admiralty, observed that those principles could not be more correctly or succinctly stated than in an extract which they gave from that report, including the passage just quoted; and, in describing the measures which ought to be taken by the neutral claimant, said, "The master, correspondent, or consul applies to a proctor, who prepares a claim, supported by an affidavit of the claimant, stating briefly to whom, as he believes, the ship and goods claimed belong, and that no enemy has any right or interest in them." Wheaton on Captures, 311, 314.

It has often been said by judges of high authority that the claimant has the burden of proving his title to the property. But in the leading cases in which this was said there was but a single claimant, and either, as in *The Walsingham Packet*, 2 C. Rob. 77, 87, and *The Bremen Flugge*, 4 id. 90, 92, the words "support his title" were used as equivalent to the general expression "prove the neutrality of the property;" *Croudson* v. *Leonard*, 4 Cranch, 434, 437; *The Mary*, 9 Cranch, 126, 146; Story's note, 1 Wheat. 506; *The Amiable Isabella*, 6 Wheat. 1, 77; or else the neutral claimant asserted a title in property appearing to have once belonged to an enemy, as in *The Rosalie & Betty*, 2 C. Rob. 343, 359; *The Countess of Lauderdale*, 4 id. 283; and *The Soglasie*, 2 Spinks, 101; s. c. Spinks Prize Cases, 104. And in *The Maria*, 11 Moo. P. C. C. 271, 286, 287, Lord Chief Justice Cockburn, delivering the judgment of himself, Lords Justices Knight Bruce and Turner, Sir Edward Ryan, Sir John Dodson, and Mr. Justice

Maule, reversing upon the facts a decree of Dr. Lushington, emphatically declined to assent to the application of the rule to a case in which the property appeared to be neutral, although not shown to belong to the claimant.

The proceedings of a prize court being *in rem*, its decree, as is now universally admitted, is conclusive, against all the world, as to all matters decided and within its jurisdiction. *Williams* v. *Armroyd*, 7 Cranch, 423 ; *Bradstreet* v. *Neptune Ins. Co.*, 3 Sumn. 600. But it does not, as Chief Justice Marshall observed, " establish any particular fact, without which the sentence may have been rightfully pronounced." If the vessel is condemned as prize and sold by order of the court, the decree of condemnation and sale is conclusive evidence of the lawfulness of the capture and of the title of the purchaser. But if, as is usual, it does not state the ground of condemnation, it is not even conclusive that the vessel is enemy's property, for it may have been neutral property condemned for resisting a search, or attempting to enter a blockaded port ; and, " of consequence, this sentence, being only conclusive of its own correctness, leaves the fact of real title open to investigation." *Maley* v. *Shattuck*, 3 Cranch, 458, 488.

So a decree of acquittal and restitution conclusively determines as to all the world that the vessel is not lawful prize of war. *The Apollon*, 9 Wheat. 362 ; *Magoun* v. *New England Marine Ins. Co.*, 1 Story, 157. But, as it operates *in rem*, it is not invalidated by the fact that pending the proceedings the sole claimant has died and his representatives have not been made parties. *Penhallow* v. *Doane*, 3 Dall. 54, 86, 91 ; Story's note, 2 Wheat. Appendix, 68 ; 3 Phillimore's International Law, sect. 492. It does not establish the title of any particular person, unless conflicting claims are presented to the court and passed upon. In *Penhallow* v. *Doane*, Mr. Justice Iredell said : " In case of a *bona fide* claim, it may appear to be good by the proofs offered to the court, but another person living at a distance may have a superior claim which he has no opportunity to exhibit. It is true a general monition issues, and this is considered notice to all the world, but though this be the construction of the law from the necessity of the case, it would be absurd to infer in fact that all the world had actual notice,

and therefore no superior claimant to the one before the court could possibly exist." 3 Dall. 91.

When no other person interposes a claim, restitution of ship or goods is ordinarily decreed to the master as representing the interests of all concerned, or to the person who by the ship's papers or by the master's oath appears to be the owner. As said by Mr. Justice Story, and repeated by Sir Robert Phillimore, " The property, upon a decree of restitution, may be delivered to the master as agent of the shipper, for in such case the master is agent of the shipper, and is answerable to him." 2 Wheat. Appendix, 70; 3 Phillimore's International Law, sect. 495. See Letter of Sir William Scott and Sir John Nicholl to Chief Justice Jay, above cited; and *Rose* v. *Himely*, 4 Cranch, 241, 277, in which Chief Justice Marshall said: " Those on board a vessel are supposed to represent all who are interested in it, and if placed in a situation which requires them to take notice of any proceedings against a vessel and cargo, and enables them to assert the rights of the interested, the cause is considered as being properly heard, and all concerned are parties to it."

Even when conflicting claims of title are put in, the Prize Court will not ordinarily determine between them, unless one of the claimants is a citizen of its own country.

Thus, in a case in which an American vessel was taken by the Danes, and captured from them by an English ship of war and brought into the High Court of Admiralty as prize; the master made affidavit that he had previously sold her, under the pressure of necessity, by reason of injuries from perils of the sea, to one Ormsby, an American, from whom the Danes took her; and separate claims were presented in behalf of Ormsby and of Coit and Edwards, also Americans, who were admitted to be the original owners, and whose names appeared as such in the register and other papers of the ship, — Sir William Scott, after observing upon the circumstances attending the sale by the master, said: " But the court is not called upon to determine upon the validity of the title, which may be matter of discussion hereafter in the American courts. It is only required to give possession." " The ship's register and all the papers point to Coit and Edwards as the owners of the vessel,

and I have no hesitation in restoring the possession to them."
" I therefore restore the possession of the vessel to the persons
appearing by the register and ship's papers to be the own-
ers, without prejudice to such rights as Mr. Ormsby, or any
other persons, may have acquired by purchase, or otherwise as
shall appear to the proper court of justice in America." *The
Fanny & Elmira*, Edw. Adm. 117, 120, 121.

In *The Lilla*, 2 Sprague, 177, affirmed on appeal, 2 Cliff.
169, an American vessel owned by Maxwell, a citizen and resi-
dent of Maine, was taken by a Confederate privateer and car-
ried into Charleston, South Carolina, and there condemned and
sold by a tribunal, acting under the assumed authority of the
Confederate States, to persons who took her to England, where
she was registered in the name of one Bushby, after which she
was captured on the high seas and brought in by a United
States gunboat. Claims were presented by Maxwell and by
Bushby, and after hearing counsel in behalf of each claimant,
as well as of the captors, the court decided against the claim of
Bushby, and ordered the vessel to be restored to Maxwell, on
condition of payment of salvage to the recaptors. But the
opinion of Judge Sprague shows that jurisdiction over the
question of title was exercised only to protect the rights of one
of our own citizens against foreigners to property in the posses-
sion of the court, and that if the question of ownership were
wholly between foreigners, the court might refuse to decide it.
2 Sprague, 187.

As incidental to the question of the lawfulness of the capture,
prize courts have doubtless jurisdiction to determine the liabil-
ity of the captors for damages, expenses, and costs, occasioned
by their own wrongful acts, or by the fault of those in charge
of the prize while in their custody. *Le Caux* v. *Eden*, 2 Doug.
594, 610; *The Siren*, 7 Wall. 152; 1 Kent, Com. 359. But
the learning and research of counsel have failed to furnish a
single case, where there was but one claimant of property
libelled as prize of war, in which a prize court has undertaken
to pass upon the validity of his title as against other persons,
or in which its decree has been set up in a subsequent suit as
an adjudication of that title as between him and them.

All the proceedings in the case of the " Wren " were accord-

ing to the usual practice in prize causes. The libel was filed within three days, and the monition was returnable, and the hearing upon the evidence *in preparatorio* had, within fourteen days after the capture. The only claim put in was by the master, under oath, stating positively that he was the master and as such lawful bailee of the vessel, and claimed her for the owner. The further statement in the claim that Laird, and no other person, was the true and *bona fide* owner of the vessel, was only upon information and belief, and reference to her register in the possession of the court. That register was dated at Liverpool six months before, showed Laird to have been the owner, and had at its foot a memorandum stating that by the Merchant Shipping Act 1854 (St. 17 & 18 Vict. c. 104) it was not a document of title, and did not necessarily contain notice of all changes of ownership. The court ordered further proof from certain witnesses on specified interrogatories to be taken forthwith, and, after a final hearing upon the whole evidence, announced, within twenty-two days from the filing of the libel, its decree of condemnation, which was afterwards entered in form.

The decree of this court on appeal merely reversed the decree of condemnation and directed the vessel to be restored to the claimant. The references in the argument of counsel before this court, and in its judgment delivered by Mr. Justice Nelson, to the evidence upon the question whether she was the property of Laird or of other persons, were only by way of assisting in the determination of the sole question at issue, whether she was or was not enemy's property and therefore lawful prize. *The Wren*, 6 Wall. 582. The final decree of the District Court recited the decree and mandate of this court, and in conformity therewith ordered the proceeds to be paid to Laird, the person appearing to be the owner by the ship's papers and according to the best information and belief of the master, as stated in the claim put in by him. Neither the decree of this court nor the subsequent decree of the District Court determined, or assumed to determine, any question of title as between Laird and Prioleau or other persons who had not appeared in the cause nor contested Laird's claim.

The libellants, in this suit against Laird personally, and

against Foster & Thomson as his garnishees, have the burden of proving that the fund in the hands of the garnishees belongs to Laird. There is nothing in the acts of Prioleau, or of the garnishees as his attorneys, which estops the garnishees to deny that fact and to put the libellants to proof of it. He had no knowledge of the prize proceedings until after the decree of condemnation. Having a title to the vessel under the bill of sale from Laird, he prosecuted the appeal from that decree in Laird's name and by Laird's authority. Whatever effect Prioleau's omission to disclose his own interest might have had, if discovered, upon the issue in the prize cause, or might have, by way of estoppel, if the present suit were brought by the United States, he has done nothing which Laird or Laird's creditors have been misled by or have acted upon. The title in the vessel, as between Laird and Prioleau, was in Prioleau. The garnishees, being attorneys both of Laird and of Prioleau, received the proceeds in the name of Laird, but for Prioleau. There being no estoppel, either of record or *in pais*, the libellants fail to prove that the fund belongs to Laird, and cannot therefore maintain their attachment.

This case does not present the question whether if Prioleau were plaintiff or actor, seeking affirmative relief against Laird or against these libellants, he must be considered as standing in such a position, by reason of his having concealed from the Prize Court his own title to the vessel, and of his having permitted restitution to be decreed to Laird, that the court would decline to assist him, upon the principle applied in *De Metton* v. *Dé Mello*, 12 East, 234, and 2 Camp. 420.

*Decrees affirmed.*


MR. JUSTICE BLATCHFORD did not sit in this case, nor take any part in deciding it.