## Case No. 3,510.

### CUSHING et al. v. LAIRD.

### [15 Blatchf. 219.][1]

Circuit Court, S. D. New York. Sept. Term, 1878.[2]

ADMIRALTY APPEALS—APPEALABLE DECREES—DECREE OF ACQUITTAL IN PRIZE SUIT — EFFECT UPON TITLE.

1. In a suit in personam, in admiralty, in the district court, money in the hands of a garnishee was attached, under process of foreign attachment, as the property of the respondent. The garnishee claimed that the fund was the property of P. On the trial of that issue, the district court made a decree that the money belonged to the respondent, and that the garnishee must pay it into court. From this decree the garnishee appealed to this court. Afterwards, the district court made a money decree against the respondent, and awarded execution on it against the money in the hands of the garnishee. The garnishee appealed to this court from that decree: *Held*, that the second decree was the only final decree, and that the first

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Reversing decree of the district court in Case No. 3,509. Decree of the circuit court affirmed by supreme court in Cushing v. Laird, 107 U. S. 70, 2 Sup. Ct. 197.]

appeal was irregular, and must be dismissed, with costs.

2. The ordinary sentence of acquittal in a prize suit, even if accompanied by an order for the delivery of the property to the person appearing as claimant upon the record, does not necessarily divest others of any title they may have to the subject-matter of the capture.

3. Such claimant, when the property is restored to him, holds it in trust for the true owner of it.

4. As against such claimant, the true owner may assert his title, although he carried on the proceedings which resulted in the sentence of acquittal and in the restoration of the property to such claimant.

These were appeals by Foster and Thomson, from two decrees of the district court,— 6 Ben. 408 [Cushing v. Laird, Case No. 3,509],—one requiring them to pay into court a certain fund, and the other subjecting it to the payment of the amount found due to the libellants from the respondent. This court found the following facts:

"The steamer Wren was built at Birkenhead, England, in the year 1864, by Laird Brothers, and registered at Liverpool, England, in accordance with the laws of Great Britain, December 24th, 1864, in the name of John Laird, Jr., as owner. A certificate of this registry was issued in due form, and the vessel sailed from Liverpool, having the certificate on board, as part of her ship's papers. On the 3d of January, 1865, after the vessel had left Liverpool, John Laird, Jr., executed and delivered a bill of sale, in due form of law, whereby he conveyed her, with her tackle, &c., to Charles Kuhn Prioleau, of Liverpool, a member of the firm of Frazer, Trenholm & Co., for the consideration of £15,450, and, on the first of May, 1865, this bill of sale was duly entered at the custom house in Liverpool, and the vessel registered in the name of Prioleau, as owner. On the 13th of June, 1865, while on a voyage from Havana to Liverpool, by the way of Halifax, Nova Scotia, a portion of the crew took forcible possession of the vessel, overcame her officers and ran her into Key West, where they delivered her to the naval authorities of the United States. On the 16th of the same month of June, the attorney of the United States for the southern district of Florida filed in the district court for that district a libel of information against the steamer, as prize of war, in the words and figures following, to wit: 'District Court of the United States for the Southern District of Florida, in Admiralty. The United States v. The Steamer Wren and Cargo. Prize. To the Honorable Thomas J. Boynton, Judge of the District Court of the United States for the Southern District of Florida. The libel of Homer G. Plantz, attorney of the United States for the southern district of Florida, who libels for the United States and for all parties in interest against the steamer Wren and cargo, in a cause of prize, alleges, that Charles W. Gilley and other citizens of the

United States did, on the twelfth day of June, in the year of our Lord one thousand eight hundred and sixty-five, subdue, seize, and capture on the high seas, as a prize of war, the said steamer Wren and cargo, and that said captured property has been brought into the port and harbor of Key West, in the state of Florida, where the same now is, within the jurisdiction of this honorable court, and that the same is lawful prize of war and subject to condemnation and forfeiture as such—wherefore the said attorney prays that the usual process of attachment in prize causes may issue against said captured property; that monition may issue citing all parties having or claiming any interest or property in said captured property to appear and claim the same; that the nature, amount, and value of the said property may be determined; that due and proper proofs may be taken and heard; and that, all due and proper proceedings being had, the said captured property may, on the final hearing of this cause, by the definite sentence of this court, be condemned, forfeited, and sold, and the proceeds distributed according to law. Homer G. Plantz, U. S. Attorney, Southern District of Florida.' On the same day, the court ordered that attachment and monition be issued as prayed, returnable on Tuesday, June 27th, 1865, and, under this order, the vessel, her tackle, &c., were taken into the custody of the marshal for the district and held for condemnation, and all persons interested were cited to appear on the day named and show cause, if any they had, against such a decree. On the 26th of June, Edward C. Stiles, master of the vessel, appeared in court and filed a claim to the vessel, &c., in the words and figures following, to wit: 'United States District Court, Southern District of Florida, in Admiralty. United States vs. Steamer Wren and Cargo. Prize. And now comes Edward C. Stiles and says, that he is the master of the said steamer Wren, and, as such, is the lawful bailee of said steamer, her tackle, apparel, and furniture, and claims the same for the owner thereof. And he further says, that John Laird, a lawful British subject, residing in England, is the true and bona fide owner of said steamer, and that. no other person is the owner thereof, as appears by the register of said steamer now in the possession of the court, and as he is informed and believes. And he further says, that the said steamer had no cargo, when seized. And he further says, that he denies that said steamer is a prize of war. And he further prays restitution of said steamer, her tackle, apparel, and furniture, and that this honorable court will award such damages as shall appear to have been incurred and suffered by reason of the unlawful seizure and detention of the same, and grant such other and further relief as to the court may seem meet and just. And he will ever pray, &c. Edward C. Stiles,

Master British Steamer Wren. Samuel Walker, Proctor. Sworn and subscribed before me this 26th day of June, 1865. George D. Allen, Clerk. Southern District of New York, ss.: Edward C. Stiles, being duly sworn, deposes and says, that he is the master of the British steamer Wren, and is the claimant named in the above claim; that he knows the contents thereof, and that the matters and allegations therein contained are true in manner and form as therein set forth, and that his knowledge of the same was acquired by his relationship to said steamer as master thereof; that, on the 12th day of June, A. D. 1865, the said steamer left the port of Havana, Cuba, bound to Liverpool, England, via Halifax, Nova Scotia; that, while on the voyage to the said port, about 1½ o'clock a. m., June 13th, a portion of the crew of said steamer mutinied, and this claimant was put in irons by the mutineers, two of whom entered his room when he was asleep and overpowered him, one holding a pistol to his head; that, about the same time, as he is informed and believes, his first and second officers were also put in irons and the purser arrested, and that, when the mutiny occurred, Mr. Duggan, the third officer, and Mr. Wilson, the third engineer, were on duty; that this claimant and the said steamer were then brought into the port of Key West, where the said steamer was delivered over to the prize court by a Mr. Gilley, who at the same time took from the person of this claimant the ship's papers; that this claimant, his first and second officers and purser, were then taken from the said steamer and imprisoned in Fort Taylor; that this claimant was afterwards taken before the prize commissioner and required to give evidence; and that he answered under protest. Edward C. Stiles, Master Steamer Wren. Sworn and subscribed before me this 26th day of June, 1865. George D. Allen, Clerk.' On the 17th, 19th, and 20th days· of June the depositions of the master of the vessel, Stiles, the purser, M'Gahan, the first mate, Long, and the third mate, Duggan, were taken in preparatorio. On the 27th of June, Stiles, by his proctor, moved the court to strike out the deposition of Duggan, as he was named as one of the captors, in the letter of the captors addressed to the admiral commanding at Key West, and filed in the cause. This being refused, the court proceeded to hear the cause 'upon the allegations and pleadings, the depositions taken in preparatorio, and the papers, letters and writings found on board the vessel.' On the 29th of June, the court, upon its own motion, directed the prize commissioner to take immediately the testimony of the master, purser and first mate of the vessel, and of any other witnesses that might be produced by the claimant from the persons on board the vessel, upon certain specific interrogatories; of Charles W. Gilley and John Howard, and any other witnesses produced by the captors,

from persons on board, upon the first two of the interrogatories to be propounded to the witnesses produced from those on board by the claimant; and of any witnesses produced either by the government or the claimant, from persons not on board, upon certain other interrogatories. Two days were allowed the parties to produce witnesses. Testimony was taken under the authority of this order, and on the 3d of July, the court resumed the hearing 'upon the allegations and pleadings, the depositions taken in preparatorio, and the papers, letters, and writings found on board * * * and depositions under orders allowing further proof.' The only certificate of registry found on board was of that granted December 24th, 1864, upon which were noted, at the British consulate, Havana, changes of masters, March 24th, 1865, and June 10th, 1865. At the foot of this certificate was a note as follows: 'Note. A certificate of the registry granted under the "merchant shipping act, 1854," is not a document of title. It does not necessarily contain notice of all changes of ownership, and in no case does it contain an official record of any mortgage affecting the ship.'

"On the 8th of July the court 'announced its opinion in this (the) case, and condemnation of vessel and cargo' [see Case No. 16,-786], but, exceptions having been taken to certain rulings, the decree in form was delayed until August 15th, when it was duly entered in the words and figures following, to wit: 'District Court of the United States, Southern District of Florida, in Admiralty. The United States vs. The Steamer Wren and Cargo. Prize. A claim having been interposed for this vessel and cargo by Edward C. Stiles, master of said vessel, for and on account of John Laird, the younger, a British subject, and this cause having been heard on the libel and proofs and testimony taken in preparatorio, and pleadings of the claimant, and all due proceedings having been had, and the court being fully advised in the premises, and it appearing to the court that the said steamer Wren, her tackle, apparel, furniture and cargo were, at the time of capture, the property of enemies of the United States, it is now ordered, adjudged, and decreed, that the said steamer Wren, her tackle, apparel, furniture and cargo be condemned and forfeited to the United States, as lawful prize of war. And it is further ordered, that the clerk of this court issue a writ of venditioni exponas to the marshal of the district, for the sale of said steamer Wren, her tackle, apparel, furniture and cargo, and that the marshal make return of sale and expenses to the court, and deposit the proceeds of such sale with the assistant treasurer of the United States, subject to the order of this court, as required by law. Thomas J. Boynton, U. S. D. Judge.' From this decree an appeal by the claimant to the supreme court was in due form allowed, and the requisite security given, August 25th. Afterwards, on process duly issued, the vessel was sold, and the proceeds of the sale, amounting to $37,108.06, deposited with the assistant treasurer of the United States in the city of New York, subject to the order of the court. Subsequent to this time, Prioleau, still residing in England, retained Foster and Thomson, the garnishees in this case and attorneys and counsellors at law, doing business in the city of New York, to do whatever might be necessary for the protection of his interests. It does not appear that he had any actual knowledge of the proceedings for condemnation until after the decree was entered. As soon after their retainer as it could be done, Foster and Thomson procured a copy of the record in the district court, and had the appeal docketed in the supreme court, February 7th, 1866, they furnishing the necessary security for that purpose. They also employed additional counsel, who argued the case upon the record sent up from the district court. No additional testimony was taken, and no change in the pleadings made or applied for. Upon the argument in the supreme court, it was insisted by the attorney-general, on behalf of the government, that it appeared from the evidence that the steamer was the public property of rebel enemies at the time of the capture; and, in support of this position, reference was made to the testimony of witnesses who swore that Frazer, Trenholm & Co. were the owners. In opposition to this, it was contended by the counsel for the appellant, that there was 'not a particle of evidence to show that the steamer was ever enemies' property, but the evidence is (was) conclusive that she was at all times the property of a British neutral,' evidently referring to Laird. At the December term, 1867, of the supreme court (The Wren, 6 Wall. [73 U. S.] 582), the decree of the district court was reversed, and an order entered to the effect that the cause be remanded, with directions to restore the vessel and her cargo to the claimant, without costs. In the opinion filed at the time of the rendition of the judgment in the supreme court, it was said, that the only question in the case was, whether the vessel was the property of the enemies of the United States. In discussing this question, the late Justice Nelson, who delivered the opinion, says: 'It is quite apparent, therefore, upon the proofs, that the claimant not only built the vessel, but put his master in command in this, her first voyage, and the presumption would seem to be very strong, if not irresistible, (nothing else in the case,) that he continued the owner for the short period of six months which elapsed after she was built and before the seizure took place. In addition to this, she was in the command of a master claiming to represent Laird, as owner. These acts, in connection with the registry, afford strong evidence that the title of the vessel was in

the claimant. Now, most of the proofs relied on to disprove this evidence are wholly inadmissible and incompetent as testimony in a court of justice. We cannot think that it needs any argument to show that they do not rise to the character or dignity of testimony, in any court that respects the law of evidence.' Then, after stating that it was not unnatural to suspect, from the surrounding facts and circumstances, 'that the so called Confederate States, or their agents, had some connection, if not interested in her,' he concludes: 'But, in the view we have taken of the case, there is no foundation of legal proof of the ownership of the vessel in the Confederate States, on which these circumstances can rest, or be attached, as auxiliary considerations to influence the judgment of a court. Our conclusion is, that the decree below must be reversed and the vessel restored, but without costs.'

"After the judgment of the supreme court was entered, Foster and Thomson made a draft of a power of attorney to be executed by Laird, Jr., and Stiles, and sent it forward to Prioleau. In due time they received from Prioleau a power of attorney, in all substantial respects like their draft, properly executed, a copy of which is as follows: 'Know all men by these presents, that we, John Laird, the younger, of Birkenhead, in the county of Chester, ship-builder, and Edward Copeland Stiles, of 14 Delamere street, Upper Westbourne Terrace, London, master mariner, do, by these presents, nominate, constitute and appoint J. P. Giraud Foster and James Thomson, both of New York, in the United States of America, solicitors, jointly and each of them severally, to be the true and lawful attorneys and attorney of us, and of each of us, for us and each of us, and in our and each of our names or name, or otherwise, to receive and collect from the United States government, or any branch or officer thereof, or any depository thereof, any and all moneys, the avails or proceeds of the sale of the steamer Wren and her cargo, sold under decree of the district or circuit court of the United States, at Key West, in the southern district of Florida, by the marshal of the United States for the said district, the said decree having been reversed by the supreme court of the United States on appeal, and this power having been given to our said attorneys for receiving restitution of the avails of the said steamer Wren and cargo, with full power to give any receipts or discharges for the same, and generally to make, do, and execute all such further and other acts, deeds, matters and things in the premises, as amply as we or either of us could do if personally present, and one or more attorneys or attorney under them or him from time to time to substitute and appoint, and such appointments at pleasure to revoke, and another or others again to substitute and appoint, we and each of us hereby binding ourselves and each of us to ratify and confirm whatever shall be lawfully done by our said attorneys or either of them by virtue hereof. In witness whereof we have hereunto set our hands and seals this second day of July, one thousand eight hundred and sixty-eight. John Laird, Jr. (L. S.) Edw'd C. Stiles. (L. S.) Signed, sealed and delivered by the above named John Laird, the younger, in the presence of Wm. Stone, atty. at law, Liverpool. Signed, sealed and delivered by the above Edward C. Stiles in the presence of E. L. Rowcliffe, solicitor, 1 Bedford Row, London. I, William Henry Fletcher, notary public by royal authority, admitted and sworn, practising in Liverpool, in the county of Lancaster, in England, do hereby certify and attest unto all it shall or may concern, that the signature "John Laird, Jr.," set and subscribed opposite the first seal at foot of the power of attorney hereunto annexed, is the real signature and proper handwriting of John Laird, the younger, therein named and described, who signed the same in my presence, and in presence of Wm. Stone, Esquire, attorney at law, Liverpool. Whereof an act being required, I, the said notary, have granted these presents under my notarial form and seal of office, to serve and avail as occasion shall or may require. Done and passed in Liverpool, this fourth day of July, one thousand eight hundred and sixty-eight. In testimonium veritatis, W. Henry Fletcher, Notary Public. (Notarial Seal.) I, the undersigned, consul of the United States of America, for the port of Liverpool and its dependencies, do certify and make known to whom these presents shall come, that William H. Fletcher, whose true signature and notarial seal are subscribed and affixed to the annexed certificate, is a notary public duly authorized, admitted and sworn, residing and practising in Liverpool, to whose acts as such full faith and credit are due. Given under my hand and seal of office, at Liverpool, the 8th day of July, and year of our Lord one thousand eight hundred and sixty-eight. F. H. Morse. (Consular Seal.) I, John Newton, notary public by royal authority, admitted and sworn, practising in London, do hereby certify and attest unto all whom it shall or may concern, that the signature "Edw'd C. Stiles," set and subscribed opposite the second seal at foot of the power of attorney hereunto annexed, is the real signature and proper handwriting of Edward Copeland Stiles therein named and described, who signed the same in my presence and in presence of E. L. Rowcliffe, Esquire, solicitor, No. 1 Bedford Row, London. Whereof an act being required, I, the said notary, have granted these presents under my notarial form and seal of office, to serve and avail as occasion shall or may require. Done and passed in London this second day of July, one thousand eight hundred and sixty-eight.

In testimonium veritatis, John Newton, Not'y Public. (Notarial Seal.) Consulate of the United States of America, at London. I, Freeman H. Morse, consul of the United States of America, for London and the dependencies thereof, do hereby make known and certify to all whom it may concern, that John Newton, who hath signed the annexed certificate, is a notary public, duly admitted and sworn, and practising in the city of London aforesaid, and that to all acts by him so done full faith and credit are and ought to be given, in judicature and thereout. In testimony whereof, I have hereunto set my hand and affixed the seal of the consulate of the United States at London aforesaid, this second day of July, in the year of our Lord, one thousand eight hundred and sixty-eight, and in the ninety-second year of the independence of the United States. F. H. Morse. (Consulate Seal.)' Having received this power of attorney, Foster and Thomson obtained a mandate from the supreme court, and sent it, together with a copy of their authority, to the United States attorney for the southern district of Florida, requesting him to see that the appropriate decree was entered in the cause, and a draft, to their order, upon the assistant treasurer in New York, for the money, was transmitted to them by the judge. Afterwards, January 5th, 1869, they employed F. A. Dockray, Esq., to aid them in procuring the money from the registry of the court, advising him that the mandate, and the power of attorney under which they were acting, had already been forwarded to the court. They did not, in any of their letters to the district-attorney, or to Dockray, make mention of the fact that any other person than Laird was, or pretended to be, the owner of the fund in court.

"On the 28th of December, 1868, certain of the libellants in this cause, and the owners of one-half the ship Sonora, filed their libel in the district court for the southern district of Florida, against John Laird, Jr., in personam, to recover for the same identical wrong and injury which is in this suit complained of, and prayed, among other things, 'that his (Laird's) credits and effects in the registry of this (the) court, known as the proceeds of the steamer Wren, may (might) be attached to the amount sued for and costs.' On the 6th of January, 1869, the following order was entered in that cause: 'District Court of the United States, Southern District of Florida, in Admiralty. John N. Cushing and William Cushing, Executors of Nicholas Johnson, Deceased, Mary A. Johnson, Executrix of Henry Johnson, Deceased, Keturah M. Pritchard, Administratrix of Thomas Pritchard, Jr., Deceased, and Elizabeth H. Pritchard, Executrix of William Pritchard, Deceased, vs. John Laird, the Younger. Cause of Spoliation and Damage, Civil and Maritime. A libel having been filed in said court, in the above entitled cause,

praying for a warrant of arrest against the defendant, the said John Laird, the younger, and that he may be required to appear and answer on oath the aforesaid libel, and all and singular the matters aforesaid, and, if he cannot be found, that his goods and chattels, and, if none be found, that his credits and effects in the registry of this honorable court, or elsewhere within the jurisdiction of said court, known as the proceeds of the steamer Wren or otherwise, may be attached to answer said libellants, it is, therefore, ordered, that process issue as prayed for in said libel, returnable on the third day of May, A. D. 1869. Thomas J. Boynton, Judge.' On the 7th of the same month of January, an attachment, in the usual form, was issued to the marshal of that district, against the person of Laird, and, on the same day, the marshal returned that Laird was not found in his district, and, therefore, no service could be had. On the 20th of February, 1869, another attachment was issued to the same marshal, directing him to attach and take into his custody the proceeds of the sale of the steamer Wren, then on deposit with the assistant treasurer of the United States in the city of New York, and subject to the order of this court, wheresoever the same might be found in his precinct. To this writ the marshal made return, that he had executed the same, by serving a copy thereof by mail on the assistant treasurer of the United States in New York. It also appears that the copy was received by the assistant treasurer on or before March 4th, 1869. A monition was also issued in the cause, February 20th, returnable May 3d, and served by publication in the Key West Dispatch, once a week for six weeks, to wit, from February 27th to April 3d, and also by posting two copies in the city of Key West. On the 24th of February, 1869, Foster and Thomson, in New York, addressed J. Langdon Ward, Esq., the proctor for the libellants in this cause, in writing, as follows: 'In the Matter of the Wren. Office of Foster & Thomson, Attorneys & Counsellors, 69 Wall St., New York, Feb. 24, 1869. J. Langdon Ward, Esq. Dear Sir: Our suggestion is, that the district judge in Florida forward to us his cheque on the assistant treasurer for the proceeds of the Wren, and that we draw the funds under our authority from the claimants Laird and Stiles, and keep the proceeds in our hands sufficiently long to enable you to serve upon us any process or papers as you may be advised. Should this suggestion be satisfactory to you, we give you our personal assurance that the funds will be so retained by us. Yours truly, Foster & Thomson.' This proposition was accepted by Mr. Ward, and, March 12th, he instructed the counsel in Florida having the matter in charge, to make no objection to the transmission of a check to Foster and Thomson for the money, in the manner proposed. In the course of the negotiations which preceded the arrange-

ment, Mr. Ward was in no manner given to understand that there was any ownership, or claim of ownership, of the fund, other than such as appeared on the face of the record and the power of attorney filed with the mandate, and, in point of fact, he did not know, or have any reason to believe, that Foster & Thomson were acting in any other capacity than as attorneys for Laird and Stiles, representing their several interests as disclosed by the record in the supreme court. On the 8th of May, Dockray, acting under his employment by Foster & Thomson, and having no other authority, entered the general appearance of Laird to the libel filed in Florida against him, claimed the proceeds of the Wren in the registry of the court, and moved to dismiss the attachment. This being done, the proctors for the libellants, under their instructions from Mr. Ward, consented to the granting of the motion, and, May 10th, the necessary order to that effect was entered. On the same day, Dockray exhibited to the court the mandate of the supreme court, and, upon his motion, the following decree was entered in that cause: 'In the District Court of the U. S., Southern District of Florida, in Admiralty. The United States vs. The Steamer Wren. John Laird, Claimant. Prize. A final decree of condemnation and forfeiture of the steamer Wren having been pronounced in this cause, and an appeal having been taken to the supreme court of the United States, and the final decree having been reversed, and the property ordered to be restored to the claimant herein, and the mandate of the supreme court having been filed in this court, and it further appearing that the costs, charges and expenses in this proceeding, amounting to the sum of five thousand six hundred and sixty-six dollars and eighty-eight cents ($5,666.88), have been taxed and paid to the officers of the court severally entitled thereto, out of the proceeds of the sale of the steamer Wren, now, therefore, on motion of F. A. Dockray, Attorney and Proctor of John Laird, claimant, it is ordered, adjudged, and decreed, that the remainder of the proceeds of the steamer Wren, amounting to the sum of thirty-one thousand four hundred and forty-one dollars and sixty-two cents ($31,441.62), now on deposit with the assistant treasurer of the United States, at New York, and subject to the order of the court, be paid to the said John Laird, claimant; and it further appearing to this court that Foster & Thomson, of the city of New York, are the lawfully authorized attorneys in fact of the said John Laird, claimant, it is ordered, adjudged, and decreed that the said proceeds be paid to the said Foster & Thomson. Thos. J. Boynton, Judge.' Whereupon, checks No. 199, for $29,869.62, and No. 200, for $1,572, were drawn in favor of Foster & Thomson, of New York, attorneys for Laird and Stiles, as against the proceeds of steamer Wren, on deposit with the assistant treasurer of the United States, at New York, which checks were delivered to F. A. Dockray, Esquire, attorney for Foster & Thomson, and attorney in fact for John Laird, and his receipt therefor taken, in the words and figures following, to wit: 'In the District Court of the U. S., Southern District of Florida, in Admiralty. The United States v. The Wren, John Laird, Claimant. Prize. ($31,441.62.) Received of the Hon. Thomas J. Boynton, U. S. Judge Southern District of Florida, his check for the sum of fifteen hundred and seventy-two dollars; also his check for the sum of twenty-nine thousand eight hundred and sixty-nine and 62-100 dollars, drawn on the assistant treasurer of the U. S., at New York, and payable to the order of Foster & Thomson. F. A. Dockray, attorney for Foster & Thomson, attorneys in fact for John Laird, claimant.'

"The next day after the transmission of the drafts, to wit, May 11th, Mr. Dockray wrote Foster & Thomson as follows, 'Office of the U. S. Attorney, Southern District of Florida. Key West, May 11th, 1869. Messrs. Foster & Thomson, 69 Wall Street, New York. Dear Sirs: On the 29th day of April I filed a motion in the case of Cushing vs. Laird, to dismiss the libel and attachment for want of jurisdiction. Premising that Mr. Mallory intended to contest the motion to the fullest extent, I prepared to argue my motion very thoroughly, on my arrival here. When I reached here, Mr. Bethel manifested some alarm at my energy and confidence in the case, and telegraphed to Mr. Mallory at Pensacola to come here at once, when I found that he intended to oppose my motion with an elaborate argument, which (on the part of both of us) would necessarily involve the merits of the case. Pending this argument, I informed them of my instructions to obtain the proceeds, and of the acquiescence of Mr. Langdon Ward in the terms agreed upon. Mallory and Bethel, however, would not consent without stipulation, and telegraphed to Mr. Ward at the time I also telegraphed you to see him. Ward replied, to "consent absolutely, without bond or stipulation," to the payment of the proceeds to your order. M. and B. were not fully satisfied by this, of the intention of Cushing et al., and did not imagine that the parties libellant would consent to a dissolution of the attachment without security, as Mr. Ward had lately written them to keep the suit in court by all means in their power. I succeeded finally in inducing them to consent in writing to my motion for dissolution, if I would enter a general appearance for Laird, which I hazarded nothing in doing. I was willing for these reasons and on this defence, viz.: 1. That the dissolution of the attachment left the court free to decree upon the mandate of the supreme court and restore the proceeds to you as Laird's attys. in fact. 2. The attachment being dissolved and the money paid to you, the libellants have no case in

court, even if they had before. 3. The voluntary general appearance of Laird has no legal importance, because, the court having no jurisdiction, no voluntary act of either party can give it jurisdiction. 4. The libellants reside in one judicial district and bring suit in a second against a party in a third, or an alien domiciled abroad, which ousts the jurisdiction. 5. Even allowing or admitting the jurisdiction, (if so,) the most the libellants are able to do is to obtain judgment against Laird, and suggest it in an English court of competent jurisdiction. Meanwhile, the claim of Cushing et al. for the Sonora is pending as one of the Alabama claims, and is more than likely to be adjusted before any United States court could come to judgment on this case, and before any English court would finally afford process of execution. I send you enclosed a certified copy of the late proceedings in the matter. A copy of the decree and order of dissolution of attachment has been transmitted to the asst. treasr. of U. S. at New York, by the clerk of the court. The judge's checks, one for $29,869.62, and one for $1,-572, total $31,441.62, cover the entire proceeds on deposit with the asst. treasurer. They are forwarded to you through John Jay Philbrick, Esq., British vice consul, through his house in New York, Messrs. C. & E. Howe. 71 Broadway. I have drawn on you through him for $1,071, at sight. covering my fee and expenses, ($71.) of which I enclose a memo., and which dft. he has cashed to me. There may be a little difficulty at the asst. treasury, owing to an error (not yet fully rectified) in its ac. with the court here. The error amounts to about $600. I suggest that you present the check for $29,869.62 before that of $1,572, delaying the latter a few days. But you will ascertain more fully of the asst. treasr. about this. I leave for Jacksonville on Thursday, 13th, where I shall be glad to hear from you. I am, yours truly, &c., F. A. Dockray, Atty.' In due course of mail, Foster and Thomson received the drafts and the foregoing letter of Mr. Dockray. The drafts were not collected until after the letter was received. The money was collected upon the drafts in due course of business, and Foster & Thomson have paid on account of the same as follows: To Mr. Dockray, for his services and expenses, $1,171; to the counsel who argued the prize cause in the supreme court, $2,000. They have also a claim against the fund, for their own professional services in the supreme court and in the proceeding in Florida, amounting to $2,500. The balance of the amount collected, over the payments made as above, is still in their hands, and is the subject-matter of the controversy upon this appeal. Foster & Thomson never had any personal communication with Laird, and never received any instructions from him in regard to their acts in the premises. They were actually employed by Prioleau and communicated with Laird only through him. All that was done in Florida, after the arrangement between Mr. Ward and Foster & Thomson, in New York, was with a view of transferring the litigation to New York, where it could be carried on by both parties more conveniently than in Florida. As soon as the drafts were sent to Foster & Thomson from Florida, Mr. Ward was duly advised and he caused the attachment to be issued, under which the present proceeding is had, and which was duly served May 18th. It does not appear from the evidence, that the Wren ever entered a British port after leaving Liverpool, in December, 1864, and previous to her capture. It does not appear from the evidence, that Laird exercised any acts of ownership over the Wren, after the execution of his bill of sale, and she was actually employed nearly or quite all the time before her seizure, in running between Havana and Galveston, breaking the blockade at Galveston. At the time of the commencement of this action, all the libellants were citizens of the state of Massachusetts, and Laird was a subject of Great Britain, residing at Birkenhead, England. On the 19th of November, 1864, the libellants, or those whom they represent, caused their memorial and protests to be filed in the office of the secretary of state of the United States, in which they asked the intervention of the United States to obtain reparation from the government of Great Britain for the same identical cause of action set forth in their libel in this suit. Their claim, as filed, was as follows: Loss of vessel, above insurance, $25,800; loss of charter, $33,244.44; insurers of vessel, $30,000. The claim thus filed was included among those presented by the agent of the United States to the tribunal of arbitration, under the provisions of the treaty between the United States and Great Britain, concluded May 8th, 1871, known as the 'Treaty of Washington.' In or about the month of November, 1874, after the establishment by congress of the court of Alabama claims, these libellants, or their legal representatives, presented to that tribunal their petition, in which they demanded judgment against the United States for $134,893.34, including value of ship ($115,869.50, less insurance, $30,000,) $85,869.50, net freight, $44,-094.33 and stores, $4,929.51, and afterwards such proceedings were had upon this petition that judgment was rendered against the United States, for damages, $33,334.30; interest, $15,286.02; in all $48,620.32; which was paid in full, October 19th, 1877."

J. Langdon Ward and Robert D. Benedict, for libellants.

Aaron J. Vanderpoel, for Foster & Thomson.

Cornelius Van Santvoord, for respondent.

WAITE, Circuit Justice. These are two appeals, taken at different stages of the same

cause, to avoid the embarrassment of a mistake as to the proper decree to be appealed from. They are docketed as separate cases, but come up on the same pleadings and proofs. The only difference is, that one is taken from one decree, and the other from another. Motions to dismiss have been made in each case, and, before proceeding to consider the merits, it is necessary to decide which appeal is regular. That depends upon which of the decrees appealed from was the final decree, as to these appellants.

The appellants are garnishees in admiralty, under process of foreign attachment, in a suit in personam against a defendant not found, and who has never appeared. The libellants claim that the appellants have in their hands a fund, known as the proceeds of the steamer Wren, which they hold in trust for the defendant, Laird, and which should be subjected to the payment of the demand in the action, while the appellants say, they hold the fund for Prioleau, to whom it belongs and to whom alone they are accountable.

This issue, thus raised between these parties, was tried below before any decree was rendered against Laird, and, on the 26th of April, the court found and adjudged that the fund belonged to Laird, and amounted to $31,441.62. On the same day a further order was entered, directing the appellants to pay the fund into court, or give stipulation, with sufficient security, to abide the further order of the court in relation thereto. This stipulation they gave May 5th, and May 9th they appealed. This appeal is docketed as the first of the two cases here. Afterwards, September 19th, 1873, a decree was entered in favor of the libellants and against Laird, in the principal action, for $143,298.30, and granting execution thereon against the fund in the hands of the garnishees. From this decree the second appeal was taken, which is docketed as the second case.

The proceeding by foreign attachment is auxiliary to the principal action, and, if that action fails, nothing is gained by the attachment. The decision that the fund in the hands of the garnishees belonged to Laird was interlocutory only. It settled the title to the fund for the purposes of the suit, but did not adjudge that it be paid to the libellants. If, in the further progress of the cause, they had failed to maintain their claim against Laird, the decision would have been of no avail. The garnishees did not become finally bound to apply the fund they held to the payment of the demand sued upon, until the order to that effect was entered, September 19th. The order of April 26th left the final disposition of the fund open. The actual appropriation was not made until September 19th. The last was, therefore, the final judgment, and from that alone the appeal lies. It follows that the appeal of May 9th must be dismissed at the costs of the garnishees, appellants, and the cause retain-

ed for hearing only upon the appeal of October 3d.

Upon the merits, the principal question is as to the effect of the final decree in the prize cause, the libellants contending that it settled the title of Laird to the fund and concludes Prioleau. There can be no doubt that a judgment in rem, by a court of competent jurisdiction, binds all the world. It is, also, true, that such a judgment is conclusive as to all the essential facts upon which it rests.

Here, the cause was one of prize, and the ultimate fact to be determined was that of prize or no prize. The decision was, no prize. To that extent, confessedly, all the world is bound.

In prize causes, the captors bring the captured property into court, and ask for a sentence of condemnation, but, before this can be had, they must satisfy the court that their capture is lawful prize. Mere capture is not enough. Capture, to justify condemnation, must be lawful, and of this the court must be judicially informed. To this end, the captors are required to produce all documents and writings found on board a captured vessel, and the depositions of her master, or some of her principal officers or crew, taken in preparatorio. Upon the information thus obtained, the case is heard in the first instance, and, if the proof is such as to show that the capture could not have been lawful, there must be an acquittal, whether there be a claimant on the record or not. The right to condemnation may be resisted by a party in interest, without the interposition of a formal claim. The rule upon this subject is thus stated by the late Judge Betts, of this district: "When no proofs are expected to be offered by a claimant, beyond what are procured on the examination in preparatory, there would be no utility in his coming in with a claim in form, inasmuch as his advocate may be heard upon the captor's proof, and a condemnation as prize is never made in the first instance upon a mere default in not claiming, without at least strong presumptive evidence that it is enemy's property. The court must be informed by the proofs that it is a case of prize." Betts' Adm. 76.

A proceeding in a prize court is something more than a call upon those opposed to condemnation to come in and show cause against it. It is a suit by the captors to condemn, in which they are required, in the first instance, to make out their case by proof. That proof, at the outset, consists, as has been seen, of the documents and writings found on board and the depositions taken in preparatorio. If this leaves a doubt as to the lawfulness of the prize, further proof may be ordered. Such an order is not a matter of strict right, but always rests upon the sound discretion of the court. The reason is, that a ship's papers ought to show her true character, and her officers and crew ought to be able to give such further in-

formation as may be required in order to enable the court to act understandingly upon the question to be decided, to wit, that of prize or no prize. The burden of overcoming the effect of the proof which is thus produced in the first instance, is thrown upon the claimant. This is the meaning of the rule which throws the burden of proof upon a claimant. The preliminary proof, which the law requires the captors to bring with them, is a part of their case, and, if sufficient, must condemn, unless overcome. For this purpose, further proof may be required, but, until one opposed to condemnation presents his formal claim in the suit, he cannot be heard to ask that an order to that effect be made. The master of a captured vessel may put in the claim, but it must be for his owner, and, in practice, he is required to state, upon information and belief, who his owner is. If, upon an examination of the captor's preliminary proofs, it appears that there should be an acquittal, and no claimant has filed a claim, the court will, in some appropriate manner, ascertain and determine to whom a delivery of the property shall be made.

In this case, the captors brought the captured vessel into court and caused her to be libelled as prize of war. They also produced the documents and writings found on board, and the depositions of the master, purser, and first and third mates, taken in preparatorio. This being done, the master appeared, and, as bailee of the vessel, claimed "for the owner," stating that "Laird, a lawful British subject, residing in England, is the true and bona fide owner of said steamer, and that no other person is the owner thereof, as appears by the register of said steamer, now in the possession of the court, and as he is informed and believes." The cause was thus made ready for hearing, but, upon examination of what was on file, an order for further proof was taken. No witnesses were examined, except such as were on board the Wren at the time of the capture, and the only additional proof offered or permitted on the part of the captors related entirely to the names of the persons who took part in the seizure of the vessel, or who had knowledge of the undertaking before the commencement of its execution. The testimony being all in, the cause was again heard, July 3d, and the court, finding that the vessel "was the property of the enemies of the United States," announced its judgment of condemnation, July 8th, only twenty-six days after the vessel left Havana, twenty-four after she was brought into Key West, and twenty-two after the filing of the libel. Under such circumstances, it would seem to be clear, that the issue tried must have related only to the enemy character of the vessel, and not to its particular ownership. The legal effect of the claim put in by the master, was for the owner, believed to be Laird, whose name appeared in the certificate of registry found on board. It was, however, nowhere positively asserted that he was the real owner, and the certificate of registry to which the reference was made, and which was then in the possession of the court, bore upon its face the express declaration that it was not a document of title, and did not necessarily contain notices of all changes of ownership. It bore date December 24th, 1864, nearly six months before the capture, and there had been abundance of time for many regular and lawful changes of ownership, without an actual necessity for a new certificate, as the vessel had never returned to her home port after sailing upon her first voyage, and a new certificate could not be granted without a surrender of the old one. Merchants' Shipping Act of 1854 (17 & 18 Vict. c. 104, § 88). Prudence, undoubtedly, requires, that, when a master claims for the owner, he should state his belief as to who the owner was, but it would be dangerous to hold, in this class of cases, that a decree of acquittal, after such a statement based upon the evidence contained in the ship's papers, would cut off a title lawfully acquired after the vessel had left her port of registry, and while she was absent on a voyage.

The office of a claim is to bring the claimant into the cause, so that he may become an actor. Before a claim is filed, all a contestant's advocate can do is to present the case upon the captor's proofs, but afterwards, he may, by leave of the court, add affirmative evidence of his own. When the master presents the claim, he acts, in contemplation of law, for whom it may concern, and is required to name his supposed owner, not for the purpose of maintaining the particular owner's title against all the world, but to satisfy the court that he is acting in good faith, and that he is entitled to resist the captor's title by further proof. When, after an acquittal, the court directs that the property shall be delivered to the claimant, it is not necessarily because he has been adjudged to be the owner, but because, upon the proofs which have been submitted, he appears to be such. If, because of his apparent ownership, he gets possession of that which actually belongs to another, he does so as the representative of the true owner and must account accordingly. If, after an acquittal, a controversy arises between two conflicting claimants as to their title, and they present their respective claims to the court for adjudication, in order that it may be definitively settled who has the better right, a judgment would bind them, but not necessarily all the world. The particular litigants are concluded, because they have voluntarily submitted their rights for adjudication in the cause. As they were not compelled to come in to litigate between themselves, they would not have been bound but for their submission. So, as all the world has only been called upon to appear, if they will, and contest the sentence of condemnation, the sentence of

acquittal leaves all interested in the property free to resort to such appropriate remedies as they choose, for the settlement of their conflicting individual rights.

It seems to me clear, that, if there had been no claim in this case, and, after a sentence of acquittal, the court had ordered the vessel delivered to Laird, as the registered owner, such an order would not have transferred the title back from Prioleau to Laird. As the claim in this case was, in effect, nothing more than for him as registered owner, it is difficult to see how it adds anything to the strength of his position as against the true owner.

Prize proceedings are not at all suited to the adjudication of disputed titles to the captured property. They are essentially war measures, and necessarily summary. To a large extent, the courts, like the captors, must rely upon the evidence furnished by the vessel herself, that is to say, upon appearances. Under ordinary circumstances, a vessel ought to be able to protect herself from condemnation, if innocent, by such testimony as she can obtain from her papers and her officers and crew. The laws of all maritime nations make ample provision for documentary evidence of a vessel's true character, and the principal officers are presumed to have always at hand the means of protection against unlawful capture. Hence, proceedings in prize are always hurried forward with all convenient dispatch. This is important both to captors and owners; but especially as to owners, if they are innocent, in order that their voyage may not be unnecessarily interrupted. For this reason, all collateral questions are, as far as possible, kept out of the way, and the enquiry confined to the lawfulness of the capture. Hence it is, that in the article in the American Encyclopedia (volume 10, p. 364), so much relied upon by the counsel for the libellants, in their argument, it is said: "If he (the claimant) has but a lien, or is a mere insurer, or a mortgagee not in possession, he cannot maintain his claim, for reasons which are found in the incompetency of such a court (prize) to investigate such claims." Certainly, if it had been supposed that a decree in the cause was to settle anything else than the one question of prize or no prize, this would not have been said. If an ordinary sentence of acquittal was to have the effect of determining all conflicting claims between individual proprietors, the court ought to be competent to investigate and determine such questions. But it is practically incompetent, because the summary manner in which it necessarily acts is entirely unsuited to such enquiries. The master of a vessel is not presumed to have accurate information upon such subjects, and it is not usual for him to keep on board the evidence required in the trial of such causes. It has never been supposed, that, when a mortgagee appears as claimant, in a suit in admiralty brought to enforce a maritime lien, if he defends successfully against the lien and defeats the action, a decree dismissing the libel would settle his rights as against the mortgagor. So, too, one who. by asserting ownership, defeats a condemnation as prize, does not thereby establish his title as against a contesting owner.

I am, therefore, clearly of the opinion, that the ordinary sentence of acquittal in a prize suit, even if accompanied by an order for the delivery of the property to the person appearing as claimant upon the record, does not necessarily divest others of any title they may have to the subject-matter of the capture. It only remains to consider whether there is anything in this case to take it out of this general rule. Certainly, no issue as to Prioleau's ownership was directly presented upon the record. The case was submitted substantially upon the preliminary proofs, and the district court only decided that the property was enemies' property, and, therefore, lawful prize. The decree of the supreme court simply reversed that of the district court, and ordered restoration of the property. Upon its face, it only decided that the vessel was not enemy property. On the part of the United States, it was argued, that the register was only "a cover of the rebel title," and, on the part of the captors, that "there was not a particle of evidence to show that the steamer was ever enemies' property." The court, while conceding that it was not "unnatural or unreasonable to suspect that the so called Confederate States, or their agents, had some connection, if not interest in .her," concluded, that there was "no foundation of legal proof of the ownership of the vessel in the Confederate States, on which these circumstances can rest, or be attached, as auxiliary considerations, to influence the judgment of a court." In this there is nothing to indicate a definitive decision as between Laird and Prioleau, that Laird was the owner and Prioleau not. All it amounts to is, that the captors had not succeeded in showing that Laird had parted with his title to "the enemies of the United States." What the court might have decided, if the bill of sale to Prioleau had been in evidence, is not now the question, but what it did decide upon the evidence actually presented.

When the mandate went down from the supreme court, all the district court had to do was to enter the decree which was ordered and deliver the fund in the registry to the claimant. The effect of the decision upon the appeal was, that, as Laird was the apparent owner, he should have the possession. So, too, when the district court acted upon the mandate, it did not adjudicate upon the actual title of Laird to the fund, but simply ordered that the fund be given up to him, as the person apparently entitled to take it out of court. When Foster & Thomson received the money upon the authority

of Laird, they took it to hold, as Laird would have held it. if it had been paid to him instead of them. As the apparent registered owner of the vessel, he, under the circumstances of the case, represented the real owner, and would be accountable for all that came into his hands in his representative character. If Laird had himself drawn the fund, and placed it in the hands of Foster & Thomson for safe keeping, or if he had placed it upon special deposit in a bank, or if he actually held it in his own possession separate from his other property, it could not have been subjected by these libellants to the payment of their demand against him, because he held it, not in his own right as owner, but in trust for another. So long as Foster & Thomson hold the money, it is kept separate from the other property of Laird, and preserves its trust character.

Clearly, if this were all, the fund could not be subjected in this action. Prioleau, upon the evidence submitted in this case, was the actual owner of the vessel when captured and when sold. The proceeds, therefore, which had taken the place of the vessel, in the progress of the suit, were his when paid out of the registry of the court, and the parties to whom the payment was made took them in trust for him. They have not only been kept as a distinct and separate fund, but are proceeded against in this action as such.

But it is further insisted, that, as Prioleau employed counsel and prosecuted the appeal in the supreme court, with Laird upon the record as claimant, he stands in the position of an enemy who has put forward a neutral to claim his captured property as owner, and cannot now be heard to say that the neutral was not the owner in fact. Such I do not understand to be the effect of what was done. So far as anything appears upon the evidence in this case, Laird was in truth the owner of the vessel when she was registered, and when she sailed from Liverpool. She may have been built upon the order of Prioleau, but there is nothing whatever to show that she actually belonged to him at any time previous to the execution of the bill of sale. She was, then, when she sailed, properly registered in Laird's name, and Prioleau cannot be said to have put forward Laird as owner. because she went to sea with a certificate of Laird's registry on board. More than six weeks before her capture, Prioleau had entered his bill of sale in the custom house at her port of registry, and obtained a new registry in his own name. When she was captured, she was returning for the first time to her port of registry. There was nothing in the laws of Great Britain which made it necessary to give up the old certificate of registry and take out a new one before that time. When the vessel was brought into court, and the preliminary proofs taken and filed, the master,

in accordance with his duty, attempted, in the usual way, to protect the interests of her owners. Believing it to be important to secure the privilege of submitting further proof, and finding from the ship's papers that Laird was the registered owner, he made the necessary formal claim for the owner, stating his belief that the registered owner still continued to be the true owner. By so doing he raised no new issue upon the pleadings. The court had still to be satisfied that the vessel was enemies' property. A false claim, if discovered, would have been a strong circumstance in favor of the validity of the capture, but still there could not be a condemnation, unless the proof satisfied the court that not only Laird was not the owner but an enemy was.

As has been seen, a formal claim was not necessary to enable one having a substantial interest in the property, to argue against the sufficiency of the captors' proof. A master may employ counsel to appear for a registered owner and oppose the condemnation, and he will, ordinarily, be heard upon the case as made by the libellants, without making himself an actual claimant. In this case, there is nothing to show that Prioleau knew of the pendency of the proceedings until after the master had secured an appeal. He simply did, after this, what the master might have done, without entering a claim, before. He argued, that, upon the proof as it stood. there was no case for condemnation.

The question here presented does not arise between Prioleau and the United States. If all the truth had been spread upon the record, a different result might have been reached, and the captors might have secured their prize. But that is not now the question. A sentence of acquittal has been pronounced, and an order made for the restoration of the property to the owner. If Prioleau were now asking to have the delivery made to him instead of Laird, the court might with propriety refuse to interfere, and leave him to such remedies as he was entitled to after the money reached Laird's hands, on the ground that. having waited until a decision had been reached at his instigation, it did not lie in his mouth to object to such a decree as the record required. As between him and Laird, however, there is no estoppel, and, if he is not estopped as against Laird, he is not as against the libellants. They acquired no new rights by the decree, and they have given Laird no new credit upon the faith of it. Their rights depend upon Laird's actual title, and not upon what Prioleau may have done to save the property. The case of De Metton v. De Mello, 12 East, 234, so much relied upon, is far from being like this. There, a neutral lent his name to an enemy to neutralize property, and the enemy put the neutral forward as claimant, to prevent a condemnation. The whole thing was planned as a deliberate and

palpable fraud, and the court said, that, after the fraud had been successful, it would not hear the enemy to recover its fruits from his guilty confederate. As the parties had combined to commit a fraud, and had been successful, the law would leave them in the transaction just where it found them. Here, there was no fraudulent combination, no putting forward for the purposes of deception, but a simple contention that the captors had not, by their own showing, made out their case. Prioleau stands just where he would if, without a claim, the district court, upon the proof, had acquitted the vessel, and delivered her to Laird. When he interfered in the cause, he was not bound to put in more testimony. He had the right to stand upon the case as made. In this respect he did not occupy a position different from other litigants. He was at liberty to rely upon the weakness of his adversary's case as well as the strength of his own. The captors had no claim upon him for discovery, and he might keep silent if he chose. His promotion of the cause after the appeal placed him in no worse position than he would have been if the same decree had been rendered without his interference.

Neither do I think that the rights of the parties have been changed by what was done by Foster & Thomson to get possession of the fund. For all the purposes of this suit, they are to be treated as the representatives of Laird, in obtaining the money. If Laird was not the actual owner of the fund in his own right before it was paid to them, he was not after. The change of possession did not change the ownership. The title of Prioleau reaches behind that transaction, and behind any proceeding of these libellants, here or elsewhere, to reach the fund as Laird's. Laird would have taken the money out of court as trustee for Prioleau if it had been paid into his own hands, and Foster & Thomson, in their character as his agents, hold it clothed with the same obligation.

This disposes of the whole case. The money in the hands of Foster & Thomson was never the property of Laird, but always of Prioleau. Consequently, the judgment of the district court declaring it to be the property of Laird, and subjecting it to the decree against him, was wrong.

Many other important and interesting questions were presented upon the argument, which, in the view I have taken of the case, need not now be considered. I have, however, thought it proper to find all the facts upon which these questions rest, in order that, if there should be an appeal, the whole case may go up. Without passing upon the validity of the defence set up in the amended answer of the appellants, which the late lamented judge of the circuit allowed to be filed provisionally, I have considered it as part of the case, and found the facts upon its allegations.

The testimony in the prize cause, and which is found in that record, cannot be considered here to prove the facts put in issue by the pleadings in this case, but it may be referred to for the purpose of ascertaining what was actually decided there, if the record leaves that question otherwise in doubt. The same may be said of the briefs of counsel and the opinion of the court upon the appeal. According to my view of the matter, they are unimportant, but, to present the case in full to the reviewing court, I have found the facts they establish, if admissible, thus putting the question of their relevancy upon the record.

Let a decree be prepared to the effect, that the fund, known as the proceeds of the steamer Wren, in the hands of Foster & Thomson, when served with process in this action, was not the property of John Laird, Jr., the defendant in the principal suit, and that it cannqt be subjected to the payment of the decree against him. All orders of the district court inconsistent with this finding are reversed and set aside. As the garnishees only have appealed, no order can be made in respect to the decree against Laird. The costs of the court upon this appeal, and of the district court, so far as they relate to the proceedings under the process of garnishment, are to be paid by the libellants.

[NOTE. From this latter decree an appeal was taken by libellants to the supreme court, and the garnishees also took an appeal from the order dismissing their appeal from the first decree of the district court. Both decrees were affirmed (107 U. S. 69, 2 Sup. Ct. 197), the court saying, through Mr. Justice Gray, that it was fully satisfied, both upon principle and authority, of the correctness of the decree upon the merits; that a decree of acquittal in a prize court "does not establish the title of any particular person, unless conflicting claims are presented to the court, and passed upon;" that, "even when conflicting claims of title are put in, the prize court will not ordinarily determine between them, unless one of the claimants is a citizen of its own country." The court further said: "The libellants, in this suit against Laird personally, and against Foster & Thomson as his garnishees, have the burden of proving that the fund in the hands of the garnishees belongs to Laird. There is nothing in the acts of Prioleau, or of the garnishees as his attorneys, which estops him to deny that fact, and to put the libellants to proof of it. He had no knowledge of the prize proceedings until after the decree of condemnation. Having a title to the vessel under the bill of sale from Laird, he prosecuted the appeal from that decree in Laird's name, and by Laird's authority. Whatever effect Prioleau's omission to disclose his own interest might have had, if discovered upon the issue in the prize cause, or might have, by way of estoppel, if the present suit were brought by the United States, he has done nothing which Laird or Laird's creditors have been misled by, or have acted upon. The title in the vessel, as between Laird and Prioleau, was in Prioleau. The garnishees, being attorneys both of Laird and Prioleau, received the proceeds in the name of Laird, but for Prioleau. There being no estoppel, either of record or in pais, the libellants fail to prove that the fund belongs to Laird, and cannot, therefore, maintain their attachment."]